Haverford College *v.* James M. Rhoads and John Lynch, Supervisors of Roads and Collectors of Road Taxes, for the Township of Haverford, and the Township of Haverford, Appellants.

*Charity—College, when a public charity.*

A college is a charity if it is conducted in a way beneficial to the public at large. Whether a particular college is a public charity is a question of fact, and the test is that it is not confined to privileged individuals but is open to the indefinite public.

*Public charity—Revenue from beneficiaries does not destroy status.*

There may be a revenue, arising in the operation of a charity, derived from its beneficiaries, to aid in its maintenance, without removing its status as a public charity; but this revenue must not exceed its expenses.

*Public charity—Taxation—Haverford College nonsectarian.*

Haverford College, being a college open to all persons, educationally qualified, upon the same terms, its funds not being diverted to the education of the children of any sect in preference to others, is a public charity and as such is exempt from taxation.

The fact that its board of managers is controlled by members of the Society of Friends is immaterial, as is also the fact that certain free scholarships are restricted to Friends, since others are free to all who apply.

Argued Nov. 17, 1897. Appeal, No. 73, Oct. T., 1897, by defendants, from decree of C. P. Delaware Co., June T., 1893, No. 2, in equity, restraining the collection of road taxes assessed and levied against the corporation plaintiff. Before RICE, P. J., WICKHAM, BEAVER, ORLADY, SMITH and PORTER, JJ. Affirmed.

Injunction to restrain the collection of $405 road taxes assessed for the year 1892 on the college buildings and about fifty acres of ground. Before CLAYTON, P. J.

The bill claimed that the assessment was illegal "because Haverford College, the plaintiff, is an institution of learning founded, endowed and maintained by private charity, within the act of assembly approved the 14th day of May, 1874, and is therefore, a purely public charity within the meaning of said act and of the first section, Art. IX. of the constitution of Penna."

After answer filed an injunction was awarded on May 1, 1893, which was made perpetual by decree filed April 5, 1897, after reference to a master.

Other facts sufficiently appear from the report of the master, which is as follows.

### FINDINGS OF FACT.

The master appointed by the said court in the above matter, as appears by the certified copy of his appointment attached hereto, from the testimony submitted by the examiner in the above stated cause, finds the following facts:

1. That the "Haverford School Association" was duly incorporated by an Act of the General Assembly approved April 4, 1833, P. L. 131, having a capital stock of 600 shares of $100 each, for the purpose of establishing a seminary in which young men should be instructed in the liberal arts and sciences, which corporation it was provided should have for its officers, a secretary, treasurer and twenty-four managers, to be chosen by ballot from among its members; by a supplement to said act approved January 25, 1835, the said corporation was authorized to increase its capital stock to a sum not exceeding $100,000.

2. That the said association became possessed of a tract of land containing about two hundred acres, situate mainly in the township of Haverford and county of Delaware aforesaid, upon a part of which, situate in the township of Haverford, containing about fifty acres, the founders erected a large edifice and other buildings, and conducted a school therein for many years in pursuance of the objects for which it was established. Upon the remaining part of said land they conducted farming to assist in maintaining said school.

3. That the general assembly, by Act of March 15, 1856, P. L. 123, enacted "that the Corporation now known by the name, style and title of Haverford School Association, be authorized

to establish and maintain a college for the education of youth and other persons in the various branches of science, literature and arts.

"And the Board of Managers of said Association shall have power to confer such degrees in the arts and sciences upon the students of the College and others, when by their proficiency in learning they shall be entitled thereto, as are conferred in other colleges and universities in the United States."

4. That the said corporation thereupon established a college, and has since conducted and maintained the same in the buildings and upon the premises in and upon which said school had been theretofore maintained, to wit:—The aforesaid tract of fifty acres, which tract, with the said buildings, is necessary for the occupancy and enjoyment of the said college.

5. That the said court of common pleas of said county, on the 6th day of December, 1875, decreed an amendment to the charter of said corporation by which the title of said corporation was changed from "Haverford School Association," to "The Corporation of Haverford College," and by a further amendment decreed by said court on September 19, 1878, it was provided that "The representation and ownership of the property and franchises of 'The Corporation of Haverford College,' by means of a capital stock divided into shares, is hereby terminated, but each of the present shareholders shall remain a member of the Corporation," and it was further provided that "The Corporation shall have power to enact by-laws, providing for the election of new members and prescribing their qualifications." By a further amendment decreed by the said court on the 23d day of June, 1886, it was provided inter alia that the corporation might take and hold for the purposes of its incorporation, such amount of personal estate as might be bequeathed or given to it from time to time, and that no estate of the corporation, real or personal, should ever be divided among the members thereof.

6. That a large proportion of the original certificates of stock contained a proviso that no profits should ever be divided on the stock. Indeed the testimony of Mr. Hartshorne would tend to show that all the certificates were so framed, but this is not very material now, when we consider the fact that the stock has been abolished by the consent of all the stockholders. The

master, however, finds as a fact that the college was founded by the voluntary contributions of persons desirous of promoting its objects.

From the report of the examiner the master has thought it well at this stage of his findings to give a brief resumé of the contributions for the founding and maintenance of the college, including those by the state of Pennsylvania referred to by Mr. Vaux and a statement of its present endowment about $250,000.

. The said college was founded by the voluntary contributions of people interested in the cause of education and desirous of promoting its objects. Since the time of the founding and during the history of the institution, large sums of money have been contributed from time to time for relieving the deficiency in its income. In the year 1840, one fund of $30,000 was contributed to pay off the debt of the corporation, and in 1845, owing to the pressure of financial difficulty, the college was closed and was not reopened until 1847, when an additional sum of $50,000 was contributed as a permanent endowment fund, whereby it was able to recommence operations. This fund has been increased by contributions and legacies to $100,000, and is constantly being drawn upon to meet the deficiences in the ordinary income of the institution. In the year 1873, the sum of $18,000 was raised for the purpose of paying off accumulated deficiencies, and quite a number of smaller subscriptions have been made at different times for the same purpose. Barclay Hall, a building erected at a cost of $80,000 for the purpose of providing dormitories and study rooms for the students in 1876, was built almost entirely by subscriptions, as the sum of $73,000 was donated for that purpose.

During the three years prior to 1884, a subscription of $8,000 per year was made and paid by friends of the college for the purpose of increasing the efficiency of the college, to meet the deficiency in the income, and to reduce the debt of the institution; and in that year a sum of $50,000 was subscribed and nearly all of it paid as a further contribution to liquidate existing debt, caused by deficiencies in the income of the college, and prior to 1894, five friends agreed each to give $3,000 a year for five years, to apply, first, to all the scholarships that were necessary, and second, to apply to other current expenses.

The master also finds as a fact that that proportion of the 200 acres devoted to farming has been run at a profit ever since the college took charge of it itself, about eight years ago, and the profit is credited to the farm account and to the general expenses of the year. And notwithstanding this, and notwithstanding the contributions of its friends, by which the college has been at times relieved from debt, the results of the operations of the college have constantly been on the wrong side of the ledger, and that at the present time the debt is upwards of $64,000, of which $36,000 was incurred in operating the college. The loss in operating the college last year was $12,000, and the cost of each student was $670, the regular charge being $500.

7. The master also finds that the allegations of the seventh paragraph of the plaintiff's bill are facts, substantially as alleged. The college is open to the admission of all persons educationally qualified upon the same terms, and the funds of the corporation do not go to the education of the children of Friends or of any other sect in preference to others. The testimony upon this point, which is uncontradicted, is even more emphatic than the bill.

The objects of the institution are very clearly set forth in the act of assembly creating the "Haverford School Association," "approved April 4, 1833, and the supplement thereto, approved March 15, 1856," and are "For the education of youth and other persons in the various branches of science, literature and the arts," and for the purpose of conferring "Such degrees in arts and sciences upon the students of the college and others, when by their proficiency in learning they shall be entitled thereto, as are conferred in other colleges and universities in the United States," and the practice of the college in carrying out these objects is clearly set forth in the forcible and intelligent testimony of Mr. Asa S. Wing. There can be no doubt, and the master accordingly finds as a fact, that the fifty acres of land in question are absolutely necessary for the proper operation of the college. In 1884, when Mr. Wing became treasurer of the institution, there was a debt of about $30,000 or $40,000. Just before that time a subscription had been raised amounting to $50,000, which enabled the college to cancel its debt, so that at the close of the year 1887, the managers re-

ported the college free from debt. Since that time, notwithstanding large contributions in each year to meet current expenses, etc., the debt has yearly increased, until, at the close of the fiscal year in 1893, the debt was reported at $64,000; $36,000 of this had been incurred for running expenses of the college over and above current receipts.

Seventeen thousand dollars of it was for the cost of the double dwelling in Montgomery county. Twenty-five hundred dollars of it was for stock on farm, and about $9,000 of it for the purchase of two houses in Delaware county, occupied by Professors Crew and Leavenworth on the college property, and which the college was bound to buy from them on the termination of their services for the college. The present number of scholarships is probably about half of the whole attendance of the college, either whole or partial scholarships. The average number of scholars is between ninety and one hundred.

These scholarships are paid for from the following sources:

First: From the income of the I. V. Williamson fund; second, from the income of the Thomas P. Cope fund; third, from the income of the Edward Yarnall fund; fourth, from the income of the Richard T. Jones fund; and fifth, from the contributions made by friends of the college from year to year. The total amount credited for scholarships during the last nine years has been about $73,000. That is, the student is charged with the full price for board and tuition if he lives in the college, or for tuition only if he lives at his own home, and he is credited with whatever allowance is arranged for with him by the president of the college and the committee on scholarships, which arrangement is made before the beginning of the college term, and he finds the balance if there is any balance. Of this $73,000 about $32,000 has been from the income of the funds of the college, and the balance from donations especially for that purpose.

Some years ago the board of managers passed a minute directing that $1,000 per year should be appropriated from the income of the general or endowment fund of the college for scholarship purposes, and that has been done ever since, and the amount is included in the above $32,000. The only distinction as to terms is that the scholarship student under the I. V. Williamson fund is charged $300 per year instead of $500 per year, and in the

case of the Richard T. Jones fund, which amounts to only $5,000, the board passed a minute on receipt of this fund agreeing to give a full scholarship each year for the income of this fund whatever it might be.

8. The master also finds that the allegations of the eighth paragraph of the plaintiff's bill are facts, with the additional fact that the houses of the professors which are located on the fifty acres are separately assessed and taxed, and no exemption is asked as to them; the premises to which exemption is asked comprises the residue of the fifty acres, all of which is in the immediate use of the college, for its buildings or recreation grounds, and is reasonably necessary for that purpose. The buildings consist of the original college known as Founders' Hall, used for lecture and class rooms and laboratory, and also for dining-room, kitchen, college offices and quarters for the help, with the annex containing other of the laboratories and the gymnasium; Barclay Hall, used for dormitories and study rooms; Chase Hall, used for class rooms; Alumni Hall and Library, a large house used as a residence for students, two observatories, a machine shop, laundry, pumping station, ice house, cricket shed and some outbuildings.

### SUPPLEMENTARY FINDINGS OF FACT.

9. In addition to the facts previously found, the master finds it to be a fact that the services of all the members of the board of corporators, as well as those of the board of managers, are rendered gratuitously to the college, and that none of the officers of either board receive any compensation for their services.

In accordance with the foregoing facts, and after having examined carefully all the cases cited by counsel on either side, the master concludes as follows:

Previous to the adoption of the constitution of 1874, all exemptions from taxation were made by means of special act of the general assembly; but that great charter restricted the power of the legislature in this respect, and provided (art. 9, sec. 1) that "all taxes shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws; but the general assembly may, by general laws, exempt from taxation public property used for public purposes, actual places

of religious worship, places of burial not used or held for private or corporate profit, and institutions of purely public charity."

And in accordance therewith, the legislature enacted, Act of May 14, 1874, sec. 1, P. L. 158, inter alia, that "all hospitals, universities, colleges, seminaries, academies, associations and institutions of learning, benevolence or charity, with the grounds thereto annexed and necessary for the occupancy and enjoyment of the same, founded, endowed and maintained by public or private charity, be and they are hereby exempted from all and every county, city, borough, bounty, road, school and poor tax."

Upon this legislation must the case be decided. To do so it will be necessary to discuss, first, Is the plaintiff within the act of 1874; that is, a college, founded, endowed and maintained by public or private charity?

It was founded by subscriptions to capital stock which contained a proviso that no profits should ever be divided on the stock. In other words, the subscriptions were gifts of that much money to the corporation. This conclusion is made stronger by the fact that all the certificates of stock have been rendered up to the college, and all stock has been abolished by the consent of all the stockholders without any return for the same. We have found it to be a fact that it was founded by the voluntary contributions of persons desirous of promoting its objects, which objects were stated in the charter, "to establish and maintain a college for the education of youth and other persons in the various branches of science, literature and the arts." It has been heavily endowed from time to time by contributions of money from the state as well as from private donors, gifts of buildings, etc., and has been maintained by the income from these gifts, by large additional charitable gifts from time to time, by a profit from the farm it possesses and operates as a part of its plant, and by a low charge for the tuition and boarding of some of its beneficiaries. As the latter two items would not be sufficient to maintain the college at the present low charge for tuition, it therefore complies with the terms and meaning of the act.

It remains to be seen then, whether such a college is purely a public charity, and falls within the class of institutions the legislature is allowed to exempt by the constitution.

That a college, an institution of learning, is a charity, has

long been decided, if it is conducted in a way beneficial to the
public at large.   The education of youth and the support of
schools has been recognized as a charitable use since before the
statute of 43 Elizabeth, and the doctrine has been uniformly
held by our courts: Episcopal Academy v. Philadelphia, 150
Pa. 565.

At this institution, by means of charitable gifts to it, educa-
tion has been furnished at rates considerably below the cost to
the college and far lower than was possible without such gifts,
while nearly one half of the students, the more needy ones,
were aided by means of scholarships, or credits of money, and
several received tuition and board entirely without cost.   That
such a college is a charity has been frequently decided: Lafay-
ette Col. v. Co. of Northampton, 128 Pa. 132.

Is it a public charity?   The solution of this question is one
of fact, and the way has been made clear to a correct interpre-
tation of the facts by the able opinion of Judge MITCHELL, then
of the lower court, but now of the Supreme Bench, which was
approved by the Supreme Court in Donohugh's Appeal, 86 Pa.
306.

"The essential feature of a public use is that it is not con-
fined to privileged individuals, but is open to the indefinite
public.   It is this indefinite or unrestricted quality that give it
its 'public character.'   The smallest street in the smallest vil-
lage is a public highway of the commonwealth, and none the
less so because a vast majority of the citizens will never use it.
It is enough that they may do so if they choose.   So there is no
charity conceivable which will not, in its practical operation,
exclude a large part of mankind, and there are few which do
not do so in express terms, or by the restrictive force of the
description of the persons for whose benefit they are intended."

As it is the right to maintain a bar across it which makes a
road private, so it is the restrictions which are placed upon the
beneficiaries of the charity which makes it private.   In all prac-
tical charities there must be some restrictions, as to whom shall
be benefited; the courts have told us which restrictions are per-
missible, and which constitute the bar across the road.

Perhaps in the Burd Orphan Asylum v. The Borough of
Upper Darby, a divided court, when it reversed itself on a
rehearing of the case, went the farthest in its dictum that "A

home for the support of poor widows is a public charity; why should not a home for the support of poor Episcopalians be?" "The legal effect is the same whether the words used for the purpose of defining the beneficiaries of the donor's bounty be seamen, Episcopalians, blind persons or Catholics," etc. But in Philadelphia v. The Masonic Home, 160 Pa. 572, Judge DEAN discovers the true reasoning which distinguishes a public from a private charity. "As long as the classification is determined by some distinction which involuntarily affects or may affect any of the people, although only a small number be directly benefited, it is public. But when the right to admission depends on the fact of voluntary association with some particular society, then a distinction is made which does not concern the public at large." And his able opinion further shows that the restriction must be exclusive.

For he approves of the finding in the Burd Orphan Asylum case, although he disapproves some of the dicta, including that quoted; and the facts in that case show that the charity was limited to female orphans of a certain age, baptized into the Episcopal church, residing in Pennsylvania, after whom, until the capacity of the institution was reached, all other female orphans of that age might be admitted, the orphans of Episcopal clergymen being always preferred. In other words, the asylum was public because the general public was not excluded, but might be benefited by it, while in the case of the Masonic Home, under discussion, every one not a Mason was excluded absolutely.

In Episcopal Academy v. Philadelphia, 150 Pa. 565, the facts show a purely denominational school, under the control of the Episcopal church. Children of other denominations were not excluded by the charter, rules or practice of the school, although they were very evidently not preferred, for out of sixteen free scholars a preference was given to the number of ten, and the remainder were selected from nominations invited from the various Episcopal congregations in the city. But it was held to be a public charity because others than Episcopalians might be and were admitted.

The facts in the present case show that the plaintiff admits to its benefits all persons educationally qualified upon the same terms; that there are no restrictions, no bars across the road in

either its charter or practice, and that the funds of the institution do not go to the education of Friends, or any other sect in preference to others. That while some of the free scholarships are restricted to Friends, others are free to all who apply. The mere fact that many of its patrons and donors are Friends has no bearing on the case, provided that its objects are charitable; as it is the object accomplished, not the motive, that insures its public charity : Fire Insurance Patrol v. Boyd, 120 Pa. 624.

From these facts and the law in the cases cited, the master concludes that it is a public charity. It remains to be seen if it further complies with the provisions of the constitution, in that it is purely public charity; and Judge MITCHELL in Donohugh's Appeal, gives us the test. "Are the objects of the institution entirely for the accomplishment of the public purpose, or is there some admixture of private or individual gain?"

By the terms of the plaintiff's charter as amended, the ownership of its property is in the corporation for the purposes of its incorporation, and no part of that property can ever be divided among its members. Its members have no individual interest, for the capital is not divided into shares of stock.

And the officers of the corporation serve without remuneration; there can be no taint of private gain here. In its operation, however, a small fee is charged some of its students, which fee is shown to be less than the actual cost to the college notwithstanding its large endowments of real and personal property, and this is applied to defraying its expenses. But it has been decided in many cases that there may be a revenue arising in the operation of a charity, from its beneficiaries, to aid in its maintenance, without removing its status as a purely public charity; this revenue must not, however, exceed the expenses, and in our case it falls far short of equaling them : Philadelphia v. Woman's Christian Asso., 125 Pa. 572; Penna. Hospital v. Delaware Co., 169 Pa. 305 ; Lafayette College v. Co. of Northampton, supra ; Episcopal Academy v. Philadelphia, supra.

There is no element of individual or corporate gain, and the entire benefit goes to the public. It is contended that there is nothing to compel the corporation to maintain free scholarships. But under the terms of the trusts by which the money is held, free scholarships are compulsory. That some are restricted to Friends does not make it any the less a public charity if from

others the public are not excluded, but may and do receive the benefits : Burd Orphan Asylum, supra.

It is true that there is nothing in the charter compelling the admission of all comers, although should it refuse it would fail in its express object, as stated in the charter to " furnish instruction to young men." There is surely nothing prohibiting it, and it is the prohibitory clause, the bar across the road, which makes a private charity. All persons educationally qualified may make use of the benefits the college offers. It is in theory and practice purely public charity, founded, endowed and maintained by both public and private charity, and as such the master concludes that it is entitled to the exemption asked.

The following exceptions were taken to the report of the master : 1. The learned master erred in his finding of facts on the seventh paragraph of the plaintiff's bill. 2. The learned master erred in his conclusion of law that the corporation plaintiff is a purely public charity. 3. The learned master erred in his conclusion of law that the corporation plaintiff is entitled to exemption from taxation. And were dismissed in the following opinion by CLAYTON, P. J.

December 7, 1896. The Court. [Under the ruling of the Supreme Court in the cases cited by the master, it is difficult to see how he could arrive at any other conclusion than the one adopted by him. Whatever my own personal judgment may be, as expressed in similar cases, we must obey the superior judgment of our court of last resort, which seems to hold such institutions of learning, as the evidence in this case shows the Haverford College to be, as free from taxation.

The exceptions to the report of the master are, therefore, dismissed and the report confirmed. Let a decree be drawn by counsel and be submitted sec. reg.] [4]

### DECREE.

[Now, April 5, 1897, this cause came on to be heard and was argued by counsel, and thereupon, upon consideration thereof, it is ordered, adjudged and decreed that the injunction formerly granted in this cause be made perpetual, and it is further ordered that the said defendants pay the costs of suit.] [5]

Defendants appealed.

*Errors assigned* were (1-3) In overruling defendant's exceptions, reciting same. (4) In holding the corporation plaintiff free from taxation in the opinion filed, reciting same. (5) In making the decree perpetual as to the injunction, reciting same.

*E. H. Hall,* with him *T. Speer Dickson,* for appellants.—Instead of Haverford College being in the line of cases which are relied upon by the master and affirmed by the court, it is respectfully submitted that it should be decided by Miller's Appeal, 10 W. N. C. 168.

Upon the hearing it did not appear that the real estate taxed was stamped with any public charity, nor that the regulations might not be changed into a source of profit; it was held to be taxable: Thiel College v. Mercer Co., 101 Pa. 530.

The charter of this college enables it to receive charities, but imposes no liability on it to bestow any on the public.

The Episcopal Academy case would hardly be decided as it was, with the Supreme Court constituted as it now is, and with the same view as to what constitutes a public charity as was laid down in the case of Phila. v. Masonic Home, 160 Pa. 572.

*John G. Johnson* and *A. Lewis Smith,* for appellee.—As conceded by the argument of the appellants in this case, the question for consideration is a narrow one. The very exhaustive report of the master would seem to leave no margin to distinguish the case of the appellee from those in which the Supreme Court has sustained a claim for exemption.

The assertion that the plaintiff corporation is not subject to visitation is made in defiance of elementary principles. Since the case of Philips v. Bury, 1 Ld. Raymond, 5, this subject has been well understood. "To eleemosynary corporations a visitorial power is attached as a necessary incident:" 2 Kent's Com. 300. This power always rests somewhere. If in trustees, they in England are in turn subject to the "general superintending power of the court of chancery:" 2 Kent's Com. 303, 304. In Pennsylvania, since the Act of June 16, 1836, section 13 P. L. 784, the courts of common pleas have the jurisdiction and powers of a court of chancery "in the control, removal and dis-

charge of trustees, and the appointment of trustees, and the settlement of their accounts " and in " the supervision and control of all corporations other than those of a municipal character." It has been held that this supervision and control not only extend to all corporations other than those of a municipal character, but that under this section " the equity powers of the court, though contracted as to individuals, are general and unlimited over corporations, and are to be exercised in the ordinary mode of a court of chancery : " Sarver's Appeal, 81* Pa. 183. This principle has been asserted in many cases since. See Girard v. Philadelphia, 7 Wallace, 1.

OPINION BY PORTER, J., December 13, 1897 :

This is an appeal by the township of Haverford from the decree of the court of common pleas of Delaware county, restraining the collection of road taxes, assessed and levied against the plaintiff corporation. The cause was referred to a master whose report the court below adopted without supplemental opinion. Little can be added by us to the report, which is comprehensive and well considered. Some of the findings of fact have been challenged, but an examination of the testimony has not served to convict the master of error.

The " Haverford School Association " an incorporated association, was, by act of assembly of March 15, 1856, " authorized to establish and maintain a college for the education of youth and other persons in the various branches of science, literature and arts " and to confer degrees. By decree of the court of common pleas of Delaware county on December 6, 1875, an amendment was made to the charter, changing the name of the institution to " The Corporation of Haverford College." A further amendment was similarly made September 19, 1878, by the consent of all of the stockholders, providing that " The representation and ownership of the property and franchises of the corporation of Haverford College by means of capital stock divided into shares, is hereby terminated " etc. A still further amendment on June 23, 1886, provided that the corporation might take and hold for the purposes of its incorporation, such amount of personal estate as might be bequeathed or given to it from time to time, and that no estate of the corporation, real or personal, should ever be divided among the members thereof.

The premises, upon which the tax is levied, are the educational plant of the institution. They are occupied by buildings for lecture and class-rooms, laboratories, dining-room, kitchen, college offices, quarters for the employees, gymnasium, dormitories, study rooms, observatories, etc. The remainder of the ground sought to be exempted is used for athletic purposes, recreation grounds, lawn, etc. We have thus a college or institution of learning " with the grounds thereto annexed and necessary for the occupancy of the same " which if " founded, endowed and maintained by public or private charity " and conducted as " a purely public charity," is exempted from taxation under the act of May 14, 1874, passed pursuant to the Constitutional provision. We have thus seen how the corporation was legally founded. Although the original subscriptions were represented by certificates of stock, they were not made with the anticipation that there should be a return in profit. Subsequently these subscriptions were changed, by amendments of the charter, into donations and all private interests in the assets of the corporation were (if any existed) swept away.

The original subscriptions to the college have been supplemented from time to time by charitable gifts to maintain the organization and extend its facilities until the valuable property now sought to be made the subject of taxation, has been acquired.

At the stated annual meeting of " Haverford School Association " held May 10, 1847, the stamp of charitable foundation was set upon the general fund of the institution by the following resolution: " Resolved, That the sum of $50,000 having been subscribed by a number of Friends for the aid and support of Haverford School by the gratuitous admission of young men or otherwise, it being expressly understood that the interest only of the sum thus raised shall be expended, the treasurer is hereby authorized to collect the sums of money thus subscribed and under the direction of the board of managers securely to invest the same, the interest thereof to be applied to the purposes above recited, it being expressly understood that when any part of the principal sum shall be paid in, it shall as early thereafter as practicable be reinvested and in no case shall the said principal sum be expended or diminished." There can, therefore, be no doubt that the foundation and endowment have been by private charity.

It remains still to consider whether the institution is maintained by public or private charity. The sources of maintenance are from unconditional gifts, from special gifts or legacies in trust for specific purposes, and from the fees paid by a part of the students.

The first is palpably charitable maintenance. The second equally charitable although charged with a trust for certain educational uses or for preferred students. The third source of maintenance is derived from full-pay students and the payments made by the holders of partial scholarships. The holders of scholarships, whole or partial, as found by the master, constitute, probably about one half of the whole attendance at the college.

The fact that some of the students are so-called full-pay students, does not deprive the institution of its character as a charity. There is no profit derived therefrom. The total receipts are expended in the carrying out of the charitable design. This, however, was settled by the Episcopal Academy v. Phila., 150 Pa. 565. The maintenance of the college is, therefore, of the kind comprehended by the act of 1874.

Is there anything in the method of conducting the institution to make it other than a public charity? The only complaints seem to be that the board of managers is controlled by members of the Society of Friends and that youth of that particular sect are preferred as recipients of the benefits of the college. The first objection if sustained, might require an inquiry to be made as to the denominational connection of every member of the boards of all of the great charitable institutions, lest perchance a majority might belong to a particular sect or denomination. In point of fact, if the matter were carefully examined, it might be found that the management of some of the largest hospitals, homes and institutions of learning has, by design or accident, fallen into the control of those belonging to a particular sect. So prevalent is this that when the contrary is true, the charity is apt to announce the fact that it is non-sectarian, as if its case were exceptional. There is nothing in the objection that a majority of the managers (all of whom serve gratuitously) are of a particular sect.

Finally: Is there anything in the assertion that the college gives a preference to students of a particular sect, and thus deprives itself of the claim to be a " public " charity? The

decision above cited has answered the question against the defendant. Further than this, however, the master finds as facts: " That the plaintiff admits to its benefits all persons educationally qualified upon the same terms; that there are no restrictions, no bars across the road in either its charter or practice, and that the funds of the institution do not go to the education of Friends or any other sect in preference to others; that while some of the free scholarships are restricted to Friends, others are free to all who apply."

We do not regard it as necessary to retravel the path already well marked out by the master, through the decisions of the Supreme Court on this general question. Counsel for the defendant has endeavored to show that the master has gone astray, but the distinctions drawn do not convince us that any mistake has been made.

We therefore conclude that this college (with its college grounds) is founded, endowed, and maintained by private charity as required by the act of 1874; that its doors open to the public under reasonable restrictions make it a purely public charity within the meaning of the constitutional provision, and that its property is exempt from the tax sought to be collected.

The decree of the court below is affirmed.