## City of Harrisburg, Appellant, *v.* Presbyterian Apartments, Inc., Appellee.

Argued January 8, 1975, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*Francis B. Haas, Jr.,* City Solicitor, for appellant.

*Robert W. Barton,* with him *John D. Killian,* and *Killian & Gephart,* for appellee.

OPINION BY JUDGE ROGERS, April 22, 1975:

The City of Harrisburg has appealed from an order of the Court of Common Pleas of Dauphin County sustaining the appeal of Presbyterian Homes, Inc. from the denial by the Board of Assessment and Revision of Taxes of Dauphin County of the application of Presbyterian Homes, Inc. for exemption from local real estate taxes.

Since the law is that one claiming exemption from taxation must bring himself clearly within constitutional and statutory allowances (*Ogontz School Tax Exemption Case*, 361 Pa. 284, 65 A.2d 150 (1949)) we here record the facts presented in the City's brief, which quite properly omits none which tend to support the Board of Assessment and Revision of Taxes' denial of an exemption.

"Appellee Presbyterian Apartments, Inc. is a Pennsylvania nonprofit corporation formed in 1960 by Presbyterian Homes of Central Pennsylvania to provide apartment living for elderly middle-income persons in downtown Harrisburg. Presbyterian Homes utilized this subsidiary corporation for the purpose of acquiring Federal funds to construct an apartment building which was thereafter to be operated from rental income, with the tenants to pay off the mortgage, including interest.

. . . .

"Presbyterian Apartments, Inc. constructed a twenty-three story apartment building at 322 North Second Street, Harrisburg, Pennsylvania. Construction was financed in its entirety by a mortgage from the United States Government, Department of Housing and Urban Development ("HUD") pursuant to Section 202 of the National Housing Act of 1959 (12 U.S.C.A. §1701q). The mortgage equalled 100% of the cost of construction ($2,515,000), and has a term of fifty years with interest at the rate of 3% per annum. The difference between the 3% interest rate and the rate that would be paid on conventional mortgage financing is subsidized by the Federal Government.

"Prior to the opening of the apartment building, Presbyterian Homes of Central Pennsylvania contributed $20,000, including the purchase of movable furniture for the office and seven public rooms. This donation was originally intended to be a loan in the amount of $10,000. Other private donations consisted of a $5,000 oil-fired generator, a new piano, and other items of furniture. All of these contributions were made in connection with the original start-up of the project and amounted to approximately 1% of the capital cost. Since that time, the apartment project has paid its own expenses, including the salary of its resident manager.

"The Presbyterian Apartments have been fully occupied since the day they opened. Approximately 181 persons currently occupy the 165 living units. Admission preference is given to residents of the City of Harrisburg; between 55% and 60% of the tenants were originally residents of the City, and others formerly had ties here.

"All applicants for apartments must be 62 years of age, or may be younger if they have some type of physical handicap. Although the apartment building is designed for middle-income persons, Appellee's policy of maximizing Federal rent supplement payments has resulted in a tenant population consisting largely of persons who could be classified as low-income. Federal law does not impose an upper income requirement for admission. There are no legal or policy limitations with reference to wealth, affluence, income, or resources, and the Board of Trustees has no written guidelines for admission. There are no mandatory tenant income levels applicable to the apartment building. It is legally possible that a tenant could have $100,000 in a checking account, and an income of $20,000 per year, and still be eligible for admission as a tenant. Appellee's admissions policy does not impose any firm requirements with respect to resources or income for admission to the apartment building.

"In determining the eligibility of applicants for admission, Appellee accepts the income figure given by applicants on the admission form, and makes no further investigation of the accuracy of the figures given. If a tenant applicant had assurance of outside support, that would not appear in the income figure given on the admission form. No inquiry is made concerning any assets which an applicant may have. Although there exists a general admissions policy that preference be given to persons of middle income, the vast majority of tenants are low-income persons.

"Basic rentals at Presbyterian Apartments (after a 2.5% rent increase) range from $96.40 per month for efficiencies, to $112.75 through $148.65 per month for one-bedroom apartments. . . . Of the fourteen available parking spaces, nine are rented by tenants, one is reserved for the resident manager, two are rented to non-tenants, and the remaining spaces are used for delivery and related purposes. Parking rental and special services produced $10,620 in additional income to Presbyterian Apartments, Inc., as reflected in the 1971 budget. All income derives from rent and additional charges paid by tenants, and all expenses, including debt service, are paid from this rental income. Appellee's accountant had no knowledge of any private donations made toward the operating income of Appellee.

"Appellee pays Presbyterian Homes of Central Pennsylvania a 6% management fee for accounting and management services, and pays approximately $6,500 annually to a resident manager who also receives an apartment free of charge.

"Appellee has realized no profit in any year since its inception, and any profit which it might realize would be paid into a Debt Service Reserve Fund for reduction of the mortgage.

"Although Appellee has not maintained all of its reserve accounts at the levels originally projected, it has

operated with a small cash operating surplus. At one point, an accounting error showed a deficit operation of $47,000, when it should have reflected a break-even operation on a cash basis. Debt service payments are being made on a current basis. Although $37,700 of the final mortgage distribution from HUD was required to have been allocated to the Debt Service Reserve Account, this was not done.

"In January of 1972, Presbyterian Apartments, Inc. received approval from HUD for a 2.5% rent increase. Although the letter authorizing that rent increase seemed to indicate that an additional 5% increase might have been authorized, no such application was filed, apparently because of the bureaucratic tangle involved in obtaining rent increases.

"Although it is the policy of HUD to prohibit a *middle-income* project applicant from including any local real estate taxes in its budget, and although HUD directed the filing of the particular exemption application involved here, the same Federal department mandates that the Harrisburg Housing Authority make payments to the City in lieu of taxes for its low-income projects, in amounts which have approximated $47,000 to $49,000 per year."

Article 8, Section 2(a) of the Pennsylvania Constitution provides that "The General Assembly may by law exempt from taxation: ... (v) Institutions of purely public charity, but in the case of any real property tax exemptions only that portion of real property of such institution which is actually and regularly used for the purpose of the institution." The General Assembly by The General County Assessment Law, Act of May 22, 1933, P.L. 843, Article II, Section 204, *as amended,* 72 P.S. §5020-204 (Supp. 1974-1975) has exempted from local taxation: "(c) All . . . institutions of learning, benevolence or charity . . . with the grounds thereto annexed and necessary for the occupancy and enjoyment

of the same, founded, endowed, and maintained by public or private charity: Provided, That the entire revenue derived by the same be applied to the support and to increase the efficiency and facilities thereof, the repair and the necessary increase of grounds and buildings thereof, and for no other purpose."[1] The applicant for an exemption under the constitutional and statutory provision must show that the institution, (1) is a purely public charity, (2) was founded by public or private charity, and (3) is maintained by public or private charity. *Woods Schools Tax Exemption Case*, 406 Pa. 579, 178 A.2d 600 (1962).

*Four Freedoms House of Philadelphia, Inc. v. Philadelphia*, 443 Pa. 215, 279 A.2d 155 (1971) is directly in point with the case before us and is, as the court below properly concluded, controlling in favor of the appellee's, The Presbyterian Homes, Inc., claim for exemption. There our Supreme Court held that an apartment house for persons over the age of 62 years with limited incomes created by a labor union, and financed pursuant to Section 202 of the Housing Act of 1959 qualified for exemption. There, as here, the rentals charged were less than those in the commercial market and produced no margin of profit. In three short paragraphs Mr. Chief Justice JONES, we believe, disposed of each of the City's arguments against exemption presented here. It would be an act of supererogation on our part to extend or expound upon the consideration there given to arguments for taxability:

"Turning to the facts of the case at bar and guided by our decision in the Presbyterian Homes Tax Ex-

---

1. We are informed by the City's brief in the companion case that pursuant to Section 104 of The Fourth to Eighth Class County Assessment Law, Act of May 21, 1943, P.L. 571, *as amended*, 72 P.S. §5453.104, the City has elected to be governed by that Act rather than The General County Assessment Law. Section 202 (a)(3) of the former Act is identical to Section 204(a)(3) of the latter.

emption Case, 428 Pa. 145, 236 A.2d 776 (1968), there can be no doubt that providing low-cost housing for elderly persons with limited incomes constitutes a public charity. Nor is there any question that appellant was founded by both public and private charity. The sole question is whether appellant is maintained by public or private charity.

"Although appellant has never realized a profit and despite the fact that the rents charged by appellant are less than those charged by commercial apartments for the elderly, it was the position of the court below that appellant was not maintained by charity but rather by each tenant paying his own way.

"A similar contention was advanced and rejected in Presbyterian Homes. 'Appellants further contend that since many residents pay their way completely and 80 per cent of the operational costs are paid by the residents, the Home is a profit-making institution. We do not agree. . . . *Furthermore, the Home has never in any year realized a profit and, even more important, no profit, if there were any, would go to an individual or to a corporation operated for private profit.*' (Emphasis in original.) 428 Pa. at 153-54, 236 A.2d at 780. On these facts, the rent charged by appellant is less than the amounts charged by similarly situated, commercial lessors as it merely covers appellant's operational expenses and does not include any margin of profit. Although some jurisdictions refuse to exempt homes for the aged where there are rental payments, see, Annot., 37 A.L.R. 3d 565 (1971), we do not believe each tenant's fractional payment of the operational expenses should eliminate appellant's tax-exempt status. See, Vanguard School Tax Exemption Case, 430 Pa. 378, 243 A.2d 323 (1968) ; Hill School Tax Exemption Case, 370 Pa. 21, 87 A.2d 259 (1952). Indeed, if the charitable exemption is lost, appellant will be required to close its doors or increase the

rent; either alternative frustrates the charitable intention to provide low-cost housing for the elderly." 443 Pa. at 219, 279 A.2d at 157.

In response to the City's and the lower court's challenge to distinguish our case of *The Lutheran Home at Topton, Pennsylvania Tax Appeal,* 6 Pa. Commonwealth Ct. 199, 293 A.2d 888 (1972), we point out that the asserted objects of the charitable institution's bounty in *Topton* were required to pay nonrefundable admission fees equal to the cost of the dwelling units provided and to prove affirmatively that they were financially self-sufficient, as prerequisites to admission. Since the question of entitlement to exemption is a mixed one of law and fact, distinctions in facts are important. We are unable to find in this case any important differences as to facts from those of *Four Freedoms Home of Philadelphia v. Philadelphia, supra,* and we are required to, therefore, and do affirm the lower court's order.[2]

DISSENTING OPINION BY JUDGE KRAMER:

I respectfully dissent. I find myself in somewhat of an embarrassing position of opposing a tax exemption for what is undoubtedly a worthwhile charitable project offering low-cost housing for our elderly, at a time when our society is so conscious and concerned over the need for such programs. Nevertheless, I feel constrained under my reading of the law to file this dissent.

---

2. Two of appellee's parking spaces are rented at commercial rates to nonresidents. We have held in *Appeal of City of Harrisburg (Salem Lodge of B'Nai B'Rith Housing Corp.),* 18 Pa. Commonwealth Ct. 428, 337 A.2d 303 (1975) (No. 974 C.D. 1974, filed with this opinion), that spaces so employed are not entitled to exemption. Since the City makes no point of the issue in its brief, possibly because it believes that the exemption of two spaces is de minimus, we simply affirm the order below. Of course, the City may insist that these spaces and others similarly used be assessed in future years.

The majority concludes that the holding of our Supreme Court in *Four Freedoms House of Philadelphia, Inc. v. Philadelphia*, 443 Pa. 215, 279 A.2d 155 (1971), controls the result here. My review of that decision permits me to distinguish it from the case before us. In *Four Freedoms, supra*, the stated facts were that, "[i]n order to qualify as a tenant, a person must be over sixty-two, in good health and with a limited income of $4,500.00 per annum per single person, $5,400.00 for married couples and $6,600.00 for two persons." As noted in the majority opinion, the facts in the instant case are as follows:

"Federal law does not impose an upper income requirement for admission. There are no legal or policy limitations with reference to wealth, affluence, income, or resources, and the Board of Trustees has no written guidelines for admission. There are no mandatory tenant income levels applicable to the apartment building. It is legally possible that a tenant could have $100,000 in a checking account, and an income of $20,000 per year, and still be eligible for admission as a tenant. Appellee's admissions policy does not impose any firm requirements with respect to resources or income for admission to the apartment building."

The lower court summarized the facts in the instant case as follows:

"The only donations made to this apartment building were $20,000.00 for furniture for the office and public rooms and $5,000.00 for a generator as an auxiliary power source which together represent less than one percent of the original capital costs; the full balance was paid with the proceeds of a federal mortgage. All operating costs, including debt service, are paid from rental income, some of which represents a rent subsidy for individual tenants from the federal government. Thus the entire costs and its operating income may be said to come from the federal government and rents paid by tenants. The primary objective of the

federal program is to furnish rental housing for 'middle income' elderly persons. Moreover, there are no legally binding guidelines for admission to the project and no mandatory standards limiting entry to persons of any particular income level. And no inquiry is made nor requirements imposed with respect to financial or property resources available to prospective tenants. Finally, there is no investigation of accuracy of the income stated by applicants for admittance."

My review of the law leads me to conclude that these facts prohibit a tax exemption for the appellee in this case.

Statutory provisions exempting property from taxation are subject to a strict construction. *See Four Freedoms, supra.* Whether the appellee is an institution of "purely public charity" within the meaning of the constitution is a mixed question of fact and law. *Hill School Tax Exemption Case,* 370 Pa. 21, 87 A.2d 259 (1952).

The Supreme Court in *Four Freedoms* stated that: "[T]here can be no doubt that providing low-cost housing for elderly persons *with limited incomes* constitutes a public charity." (Emphasis added.) 443 Pa. at 219, 279 A.2d at 157.

I believe that the proviso "with limited income" is the controlling factor and I cannot agree that the apartments in the instant case, which have no income limitation, are a purely public charity. It is true that the home involved in the *Presbyterian Homes Tax Exemption Case,* 428 Pa. 145, 236 A.2d 776 (1968), had no income requirement, but in that case admission was available specifically to those who were unable to meet the usual charges as well as to those who could afford to pay. Also, the home involved in *Presbyterian Homes, supra,* was established by gifts and contributions, and it had always operated at a loss. I recognize that the Supreme Court, in *Presbyterian Homes, supra,* used some very broad

language and indicated that a liberal interpretation should be given to the words "charity" and "public charity." Nonetheless, my reading of *Presbyterian Homes, supra,* leads me to believe that in that case the Supreme Court was primarily concerned with low-cost housing for the *needy* aged and the aged who are *unable to adequately care for themselves.* Both of these factors are absent in the instant case. There is no requirement in the instant case that a tenant have any sort of need (financial, physical or otherwise) for the advantages offered by the apartments. Absent some sort of entrance requirements, it is possible that the population of the apartments could be composed entirely of persons with no real need for the facilities.[1] If the apartments in the instant case would have some sort of admissions requirement based upon need or at the very least require that some high percentage of the tenants make a showing of need, then I could agree that they might qualify as a "purely public charity." Absent such standards or requirements, I simply cannot agree with the majority's conclusion that these apartments are a "purely public charity."

This Court recently, in *Robert Morris College v. Board of Property Assessment,* 5 Pa. Commonwealth Ct. 648, 655, 291 A.2d 567, 572 (1972) set forth the principles behind charitable exemptions. We stated:

"We must begin with an understanding of the underlying philosophy of the constitutional-legislative grant of tax exemption. 'Taxes are not penalties but are contributions which all inhabitants are expected to make (and may be compelled to make) for the support of the manifold activities of government. Every inhabitant and every parcel of property receives gov-

---

1. I recognize that the record in this case indicates that the present inhabitants of the apartments are primarily low or middle income but absent admission standards I see no guarantee that the status quo will be maintained.

mental protection. Such protection costs money. When an inhabitant fails to contribute his share of the cost of this protection, some other inhabitant must contribute more than his fair share of that cost. . . . Any institution which by its charitable activities relieves the government of part of this burden is conferring a pecuniary benefit upon the body politic, and in receiving exemption from taxation it is merely being given a 'quid pro quo' for its services in providing something which otherwise the government would have to provide. . . . The measure of an institution's gratuitous aid to those requiring it is the measure by which the government is relieved of its responsibilities.' YMCA of Germantown v. Philadelphia, 323 Pa. 401, 413-14, 187 A. 204, 210 (1936)." (Footnote omitted.)

In *Robert Morris* we pointed out that " '[p]urely' to us means it must be entirely or wholly a public charity in every sense of the word, which would include all of the elements found in the word 'eleemosynary'."

In summary, my reading of the facts in this case leads me to conclude that the apartments are not operated as a "purely public charity" and therefore do not qualify for a tax exemption. I would reverse the court below.

President Judge BOWMAN and Judge MENCER join in this dissent.