Appeal of the Episcopal Community Services of the Diocese of Pennsylvania (Trustees Philadelphia Protestant Episcopal City Mission of Pennsylvania) From the Real Estate Assessment and Exemption Denial for the Year 1979. Springfield Township and Springfield School District, Appellants.

Appeal of the Episcopal Community Services of the Diocese of Pennsylvania (Trustees Philadelphia Protestant Episcopal City Mission of Pennsylvania) From the Real Estate Assessment and Exemption Denial for the Year 1979. Springfield Township and Springfield School District, Appellants.

Appeal of the Episcopal Community Services of the Diocese of Pennsylvania (Trustees Philadelphia Protestant Episcopal City Mission of Pennsylvania) From the Real Estate Assessment and Exemption Denial for the Year 1979. Springfield Township and Springfield School District, Appellants.

Appeal of the Episcopal Community Services of the Diocese of Pennsylvania (Trustees Philadelphia Protestant Episcopal City Mission of Pennsylvania) From the Real Estate Assessment and Exemption Denial for the Year 1979. Springfield Township and Springfield School District, Appellants.

Argued April 9, 1985, before Judges ROGERS, MACPHAIL and PALLADINO, sitting as a panel of three.

*Michael J. O'Donoghue*, with him, *Thomas M. Garrity* and *Charles Potash, Wisler, Pearlstine, Talone, Craig & Garrity,* for appellants.

*William C. Bullitt, Drinker, Biddle & Reath,* Of Counsel: *Anthony J. Giangiulio* and *Edwin S. Heins,* for appellee.

OPINION BY JUDGE MACPHAIL, July 16, 1985:

In these consolidated appeals, the Springfield Township and Springfield Township School District (Appellant) appeal here an order of the Court of Common Pleas of Montgomery County which sustained the tax exemption claim of Episcopal Community Services of the Diocese of Pennsylvania (Appellee) with respect to its Springfield Retirement Residence (Springfield).[1] We affirm.

---

[1] On October 23, 1980, The Honorable LOUIS D. STEFAN of the Common Pleas Court of Montgomery County made exhaustive find-

Appellee, a non-profit corporation, owns and operates Springfield. Springfield consists of 122 residential apartments as well as a common kitchen, laundromat, meeting rooms, chapel, and other facilities for use by the residents. Springfield also houses a fully accredited nursing facility, doctor's office and examining room. Additional medical care is furnished by All Saints Hospital, a medical facility operated by Appellee on the same real estate as Springfield is situate, and Chestnut Hill Hospital.

To be eligible for admission into Springfield, the applicant must be at least 65 years of age and able to take care of his or her personal needs (i.e., bathing, dressing) with exceptions made for those who are blind, deaf or lame. Proof of this "independence" must be furnished in the form of a physician's report. The applicant is also required to submit a detailed financial statement. No one may be denied admission because of race, color, creed or national origin; nor is anyone refused admission because of the financial status of his or her assets.

Each resident of Springfield is charged an initial entrance fee.[2] Additionally, residents are subject to a monthly charge for care and service.[3] Each resi-

ing of fact and issued an Adjudication and Decree Nisi which denied Appellee the exemption. Appellee filed exceptions to the adjudication and the matter was reargued before the court en banc. The en banc court adopted the findings made on October 23, 1980, and summarized them in the February 9, 1983 decision sustaining Appellee's exceptions and granting the exemption. We will refer only to the Findings of Fact made on October 23, 1980 as to which there is no dispute in this appeal. The en banc court reversed the chancellor on the basis of decisions made by our Supreme Court after the chancellor's adjudication was filed.

[2] The entrance fee in 1979 ranged from $18,480 to $45,552. Finding of Fact No. 51.

[3] In 1979, the monthly charge for care and service was between $495 to $1,102. Finding of Fact No. 52.

dent signs a "life care" contract with Springfield which provides that a resident will be charged only the monthly fee, no matter what level of care the resident requires. This "Residence and Care Agreement" also provides that it is the "policy [of Springfield] that within the limits of [its] ability to furnish assistance, a resident shall not be dismissed nor his residence agreement terminated solely because of the resident's financial inability to continue to pay the monthly rent." This policy is subject to certain conditions, among them the right of Springfield to terminate the agreement in lieu of subsidization for failure to meet monthly charges.[4]

[4] The trial court summarized the General Conditions as follows in Finding of Fact No. 56:

Exhibit P-35, entitled "General Conditions," states that "It is the policy of (Springfield Retirement Residence) that within the limits of (Springfield Retirement Residence's) ability to furnish assistance, a resident shall not be dismissed nor his residence agreement terminated solely because of resident's financial inability to continue to pay the monthly rate." This "policy," however, is expressly conditioned on the following:

(a) No gift has been made before or since the execution of the agreement with Springfield Retirement Residence which would impair the resident's ability or the ability of his estate to satisfy his financial obligations under the agreement.

(b) The "policy" of Springfield does not "in any way (qualify) the right of (Springfield Retirement Residence) to terminate this agreement."

(c) The sole reason for non-payment must be insufficient funds beyond the control of the resident.

(d) The resident must present facts which in Springfield's opinion justifies special financial consideration.

(e) Subsidies will be granted or continued only if they do not impair the ability of Springfield to attain its objectives while operating . . . without profit to Springfield but consistent with operating on a sound financial basis.

(f) All determinations made by Springfield concerning the granting or continuance of subsidies shall be final.

The basis for Appellee's claim of tax exemption is Section 204(a)(3) of The General County Assessment Law (Law), Act of May 22, 1933, P.L. 853, *as amended,* 72 P.S. §5020-204(a)(3), which provides in pertinent part that:

    (a) The following property shall be exempt from all county, borough, town, township, road, poor, and school tax, to wit:

    . . . .

    (3) All hospitals, universities, colleges, seminaries, academies, associations and institutions of learning, benevolence or charity, including fire and rescue stations, with the grounds thereto annexed and necessary for the occupancy and enjoyment of the same, founded, endowed and maintained by public or private charity: Provided, That the entire revenue de-

    (g) The resident must make every reasonable effort to obtain assistance from family connections or other available means and if the resident can qualify, he must take the necessary steps to obtain county, state or federal aid or assistance.

    (h) Any resident being subsidized may not sell or otherwise transfer any property without the written consent of Springfield.

    (i) Upon the death of any resident who has been subsidized during his stay at Springfield, his estate shall be liable to Springfield in an amount equal to the difference between the total cost of maintaining the resident for the entire time of residency and the total of the payments actually made by the resident during that time, together with an additional amount to reimburse Springfield for the decline in the purchasing power of any recovery from such resident's estate computed by reference to the appropriate U.S. Bureau of Labor Statistics indices for the periods intervening between the payment of subsidies by the community and the receipt of such reimbursement.

    (j) Springfield may at any time request financial statements and copies of tax returns from any resident who has received a subsidy.

rived by the same be applied to the support and to increase the efficiency and facilities thereof, the repair and the necessary increases of grounds and buildings thereof, and for no other purpose.

The question as to whether the Appellee is entitled to the exemption is a mixed question of law and fact. *Hill School Tax Exemption Case,* 370 Pa. 21, 87 A.2d 259 (1952); *General Conference Mennonite Appeal,* 72 Pa. Commonwealth Ct. 96, 455 A.2d 1274 (1983). The burden of proving that it falls within the ambit of the statute and is entitled to the exemption is upon Appellee. *Presbyterian-University of Pennsylvania Medical Center v. Board of Revision of Taxes,* 24 Pa. Commonwealth Ct. 461, 357 A.2d 696 (1976). Statutory provisions which exempt property from taxation are subject to strict construction. *General Conference Mennonite Appeal.*

Case law has established a three-pronged test to be applied when a claim is made for real estate tax exemption: ''[T]o obtain the claimed exemption from taxation, [Appellee] must affirmatively show that the entire institution, (1) is one of 'purely public charity'; (2) was founded by public or private charity; (3) is maintained by public or private charity.'' *Woods School Tax Exemption Case,* 406 Pa. 579, 584, 178 A.2d 600, 602 (1962).

Although our Supreme Court has cautioned that prior cases have limited value as precedent in this area of the law, *Presbyterian Homes Tax Exemption Case,* 428 Pa. 145, 236 A.2d 776 (1968), we must, nevertheless, look to case law for guidance realizing that the factual background of each case is of utmost importance.

In *Presbyterian Homes,* our Supreme Court held that the retirement home there under consideration qualified for tax exemption, emphasizing that although

expenses were charged to most of its residents, it was not being operated in commercial competition with commercial homes for the aged. 428 Pa. at 151, 236 A.2d at 779. Even though many of the residents paid their own way completely and 80% of the operational costs were paid by the residents of Presbyterian Homes, the Court stressed that Presbyterian Homes was not a profit-making institution. The Supreme Court specifically declined to hold that ''whenever a non-profit institution made a charge for its care or services to any resident or patient, the institution would be precluded from obtaining tax exemption.'' 428 Pa. at 154, 236 A.2d at 780. The Court reasoned that:

> ''A purely public charity does not cease to be such where it receives some payment for its services. Thus a hospital may be such a charity where it maintains both private patient and ward service, its facilities being available to all. . . . The dormitories of the Pittsburgh Salvation Army are not subject to tax merely because the institution makes a charge for the use of its facilities, at a figure which is clearly not commercial. . . . And by the same reasoning, a university, school or educational institution which makes a tuition charge to its students, does not *thereby alone* release and relinquish its privilege to tax exemption.'' (Emphasis in original; citations omitted.)

428 Pa. at 154, 236 A.2d at 781, quoting *Hill School Tax Exemption Case,* 370 Pa. 27, 87 A.2d at 263.

In *Appeal of Marple Newtown School District,* 500 Pa. 160, 455 A.2d 98 (1982), the Supreme Court reversed a Commonwealth Court decision holding that Dunwoody Village, a retirement village, was a purely public charity. The Supreme Court summarily rejected our determination:

Here, however, the record is clear that financial security is a prerequisite to the admission of *all* residents of the Dunwoody Village. If an applicant fails to meet this prerequisite, the applicant will not be further considered. Subsidization of a resident's required charges by the Village is a remote possibility, at best, as indicated by the fact that only one resident of the Village has been subsidized since the Village has been in operation. Even when the possibility of a need for subsidization arises, the decision to subsidize is wholly within the discretion of the Village, whose other options included the termination of the care agreement. Thus, on this record, it cannot be concluded that the charitable purpose found in Presbyterian Homes is shared by Dunwoody Village, a private housing facility which for all practical purposes offers its residents no services beyond those which the residents demonstrate an ability to afford.

500 Pa. at 165-66, 455 A.2d at 100.

In *West Allegheny Hospital v. Board of Property Assessment*, 500 Pa. 236, 455 A.2d 1170 (1982) decided the same day as *Marple Newtown,* our Supreme Court reversed a decision of the Commonwealth Court which denied West Allegheny Hospital's exemption claim. In deciding that the hospital had been endowed and maintained by public or private charity, the Supreme Court stated that the fact that the hospital billed its patients did not necessarily warrant the inference that the billings placed a disproportionate burden of the hospital's operating costs on patients. The Court determined that the revenues from patient billings had been used by the hospital for no other purpose than to contribute to the support and maintenance of the hospital. "[O]ur reading of the proviso

to [S]ection 204(a)(3) convinces us that the word 'charity' as used by the Legislature does not contemplate the requirement that there be only a nominal charge to the beneficiaries." *West Allegheny Hospital*, 500 Pa. at 243, 455 A.2d at 1173.

We applied the precepts of *Marple Newton* in *General Conference Mennonite Appeal*, 72 Pa. Commonwealth Ct. 96, 455 A.2d 1274 (1983), wherein we held that the retirement complex in question, the Frederick Mennonite Home (Home), was not a purely public charity founded and maintained by charity. We first noted the similarities between the Home and Dunwoody Village: both were composed of apartments close to a medical facility; both required residents to pay an entrance fee and monthly charge; both required residents to demonstrate their good health and financial ability; and both required the execution of a formal agreement which gave each institution the right to require a resident to leave if unable to pay. The determining factor in both cases, in our view, was the fact that in neither case was there a realistic prospect of a resident receiving a financial subsidy. We therefore held that *Marple Newton* required us to reject the Home's argument that its retirement complex was a purely public charity as that phrase is used in our law.

The only matter in dispute in the instant case is whether Springfield has been maintained by public or private charity.[5] Appellant contends that in light of the substantial entrance fees and monthly charges,

---

[5] The trial court made extensive findings of fact which, without going into unnecesary detail, are supported in the record and which conclude that Springfield is properly considered to have been founded by public or private charity.

We note that of the $1,500,000 which was pledged and donated to construct Springfield, $300,000 was set aside to assist indigent applicants who could not afford the entrance fees and $400,000 was

lack of contractual obligation to subsidize residents who cannot afford these charges, lack of meaningful subsidies actually donated *by Springfield*,[6] that Springfield is not a purely public charity maintained by public or private charity. We must disagree.

---

placed in trust, the income from which was to be used to supplement the monthly charges. The balance of the pledges, $800,000 was used to construct the Springfield facility. Finding of Facts Nos. 35 and 36.

Although the chancellor concluded as a matter of law that Springfield was not a purely public charity, the en banc court of which he was a member reached a contrary conclusion after its careful consideration of our Supreme Court's decisions in *Marple Newton and West Allegheny Hospital.* We have reviewed the evidence in light of our Supreme Court's most recent pronouncement of what constitutes a purely public charity in *Hospital Utilization Project v. Commonwealth*, Pa. , 487 A.2d 1306 (1985) and conclude that the en banc court was correct in its determination.

[6] Appellant argues that because Appellee itself does not provide the subsidies, it cannot qualify for the exemption. The pertinent findings made by the trial court in this regard are as follows:

26. ECS [Appellee herein] derives its funds from various sources. There is a central endowment fund which has been built up over a century, some of which is restricted as to use of income and/or as to areas of activities. An annual fund drive elicits private and individual contributions, and moneys are also received from the Episcopal Diocese of Pennsylvania. ECS receives third party payments and special purpose grants of public funds under various Federal and State Welfare and Health programs. (N.T. 76, 77).

. . . .

46. The monthly subsidies for residents of Springfield Retirement Residence have averaged since the opening of the facility between $25,000 and $30,000 a month. These supplements are obtained from sources available to ECS, the various trusts which have heretofore been alluded to, foundations and donations from the various parishes and members of the Protestant Episcopal Diocese of Pennsylvania. The monthly subsidies range from a low of $95 per month to as high as $2,000 a month. (N.T. 137).

. . . .

As previously noted, Springfield's application process requires that the applicant complete a financial statement. The financial statement is evaluated to determine what the applicant's monthly income will be after deducting an amount equal to the entrance

49. The total amount of monthly supplemental payments supplied by Springfield Retirement Residence through the various charitable sources available to it for its indigent residents between the date of the opening of the facility until September 31, 1979, came to $633,121. In addition thereto, on July 1, 1977, all residents of the Springfield Retirement Residence were required to execute new contracts for life care, and all residents who came into the facility after that date had to execute similar contracts. The cost of the life care contracts has been subsidized by Springfield Retirement Residence through funds available from ECS to the extent of $215,020.

. . . .

54. Of the 206 residents who have been at the facility since it was opened on October 1, 1975, 68 had assets on admission of less than $1,000 and their entrance fees, as well as their monthly rentals, were completely subsidized by public charity.

. . . .

65. All revenues received from the operation of Springfield Retirement Residence are specifically designated for the support of the work of the Springfield Retirement Residence and not used for any other division of ECS. (N.T. 90).

. . . .

66. Since the opening of the Springfield Retirement Residence, 67 persons have received a direct subsidy of their entrance fees or their monthly service charge (Ex. P-25). Of those 67 persons, at least 59 received their subsidy from charitable organizations separate and distinct from Episcopal Community Services (N.T. 191). In addition, the next person who is going to be admitted from the list of people requiring subsidies is a person whose full entrance fee has been paid by "a certain philanthropic group," and not by ECS. (N.T. 189).

fee. As we have noted, no application is denied solely on account of financial inability.

If the application is approved, the applicant is placed on one of two lists: a financial aid list and a non-financial aid list. When there is an available residence at Springfield, applicants are taken from the lists in chronological order. Applicants are only taken from the financial aid list when there is a subsidy available, with the proviso that the amount of subsidy available determines who will be admitted from the list. For example, if there is a $2,000 subsidy available, the first name on the list that needed only $2,000 would be admitted, no matter where he stood on the list.

As of December, 1979, 59 out of the 140 residents received some sort of subsidy—a figure slightly less than half. September of 1977 was the last time an individual was admitted from the financial aid list. Since 1977, a total of 34 individuals have been admitted to Springfield, none of whom are subsidized.

In *Presbyterian Homes,* residents were admitted under one of three plans, only one of which presupposed financial security; half of the residents were admitted under this plan. Similarly, residents at Springfield are admitted under two plans, one of which presupposes financial security. Financial security is therefore not a prerequisite to the admission of all residents of Springfield. And although the decision to subsidize residents is wholly within the discretion of Springfield, whose other options include terminating the "life care" contract, the factor we held to be determinative in *Marple Newton* and *General Conference Mennonite Appeal*—no realistic prospect of financial subsidization—is not present in the instant case. No resident has ever been required to leave because he could no longer meet the monthly charges; if a resident cannot meet an increase in

charges, he is granted a subsidy. There was no evidence presented to indicate that the subsidization policy espoused by Springfield was not utilized.

Springfield has never realized a profit, and all revenues received from the entrance fees and monthly charges are specifically designated for the support and maintenance of Springfield. We agree with the trial court that the real estate is being put to a public charitable use and that although expenses are charged, the evidence and the findings demonstrate that Springfield is not being operated as a commercial enterprise. *Presbyterian Homes*.

We will affirm the order of the trial court.

ORDER

The order of the Court of Common Pleas of Montgomery County, dated February 9, 1983, at Nos. 76-17761, 77-20751, 78-16789 and 79-21547 is affirmed.