704 A.2d 120

Appeal of the CITY OF WASHINGTON from Action of the Board of Assessment Appeals of Washington County, Pennsylvania on Property Situate in the City of Washington, Appellant,

v.

BOARD OF ASSESSMENT APPEALS OF WASHINGTON COUNTY, Pennsylvania and Washington & Jefferson College, Appellees.

Supreme Court of Pennsylvania.

Argued March 4, 1997.

Decided Nov. 20, 1997.

176

178

John Patrick, Washington County Sol., Ira Weiss, Pittsburgh, Washington School Dist. & School Dist. of City of Pittsburgh, amici curiae.

Claude C. Council, Jr., Pittsburgh, Pittsburgh School Dist., amicus curiae.

Clifford B. Levine and Stuart C. Gaul, Pittsburgh, Howard E. Goldfarb, Washington, for Washington & Jefferson College.

George T. Bell, Harrisburg, for Independent Colleges & Universities & Pennsylvania Ass'n of Colleges & Universities, amici curiae.

Stewart M. Weintraub, Philadelphia, American Jewish Congress, Com'n for Independent Colleges & Universities, Pennsylvania Ass'n of Non-Profit Homes for Aging, Pennsylvania Ass'n of Resources for People with Mental Retardation, Pennsylvania Community Providers Ass'n, Pennsylvania Federation of Museums & Historical Organizations, Pennsylvania Girl Scout Legislative Network, Pennsylvania Jewish Coalition, Pennsylvania Public Television Network, Planned Parenthood Ass'n of Pennsylvania, Resources for People with Mental Retardation, United Way of Pennsylvania & YMCAs of Pennsylvania, amici curiae.

Edward W. Seifert, Pittsburgh, Anthony Baginski, Newton Square, Martin Michaelson, John G. Roberts, Jr., Amy F. Kett, National Ass'n of Independent Colleges & Universities, American Ass'n of Colleges for Teacher Educ., American Ass'n of Colleges of Nursing, American Ass'n of Colleges, American Ass'n of State Colleges & Universities, American Council on Educ., Ass'n of American Law Schools, Ass'n of American Medical Colleges, Ass'n of American Universities, Ass'n of Catholic Colleges & Universities, Ass'n of Community College Trustees, Ass'n of Governing Boards of Universities & Colleges, College & University Personnel Ass'n, College Entrance Examination Bd., council for Advancement & Support of Educ., Council of Independent Colleges, National Ass'n of State Universities & Land Grant Colleges, National Ass'n of Student Financial Aid Administrators & National Ass'n of Student Personnel Administrators, amici curiae.

Elizabeth M. Sellers, Jane Gallagher, Pittsburgh, Independent Sector, amicus curiae.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE and NIGRO, JJ.

## OPINION OF THE COURT

FLAHERTY, Chief Justice.

This is an appeal by allowance from an order of the Commonwealth Court which reversed an order of the Court of Common Pleas of Washington County. The court of common pleas had reversed determinations of the Board of Assessment Appeals of Washington County that eighty-seven properties owned by Washington & Jefferson College (W & J) were exempt from real estate tax. The City of Washington, appellant, challenges W & J's tax-exempt status.

W & J is a private, coeducational, nonsectarian, four-year liberal arts college in Washington County. It claims exemption from tax pursuant to the General County Assessment Law, 72 P.S. § 5020–204(a)(3), which provides that all universities and colleges, "with the grounds thereto annexed and necessary for the occupancy and enjoyment of the same, founded, endowed, and maintained by public or private charity" shall be exempt from all county, city, borough, town, township, road, poor, and school taxes.[1] The exemption was enacted pursuant to a provision of the Pennsylvania Constitution which gives the legislature power to exempt from taxation "[i]nstitutions of *purely public charity*, but in the case of any real property tax exemptions only that portion of real property of such institution which is actually and regularly used for the purposes of the institution." Pa. Const. art. VIII, § 2(a)(v) (emphasis added). At issue in this appeal is whether W & J meets the constitutional prerequisite of being a "purely public charity" so that it can claim the statutory exemption.

■ In *Hospital Utilization Project v. Commonwealth*, 507 Pa. 1, 487 A.2d 1306 (1985) (*HUP*), we set forth the test that determines whether an entity constitutes a purely public charity. The test requires that the entity 1) advance a charitable purpose; 2) donate or render gratuitously a substantial portion of its services; 3) benefit a substantial and

1. W & J owns some properties that are admittedly subject to tax and that are not involved in the present appeal—primarily properties that are not related to the educational program, such as rental holdings.

indefinite class of persons who are legitimate subjects of charity; 4) relieve the government of some of its burden; and 5) operate entirely free from private profit motive.[2] *Id.* at 21–22, 487 A.2d at 1317. Here, the record demonstrates that W & J fulfills all of these requirements.

With regard to the first prong of the *HUP* test, an institution advances a charitable purpose if it benefits the public from an educational, religious, moral, physical or social standpoint. *HUP,* 507 Pa. at 18, 487 A.2d at 1315. Institutions that provide education have long been regarded by this court as serving to advance the public good and as being charitable in nature. *Hill School Tax Exemption Case,* 370 Pa. 21, 26, 87 A.2d 259, 262 (1952) (education of youth and the support of schools are charitable functions that promote the public good); *Ogontz School Tax Exemption Case,* 361 Pa. 284, 309, 65 A.2d 150, 160 (1949) (advancement of education deemed a charitable purpose); *Episcopal Academy v. Philadelphia,* 150 Pa. 565, 573, 25 A. 55, 56 (1892) ("The education of youth and the support of schools are for the advancement of public good...."); *Price v. Maxwell,* 28 Pa. 23, 34 (1857) (charitable nature of educational institutions); *Haverford College v. Rhoads,* 6 Pa.Super. 71 (1896) (college qualified as a purely public charity). W & J provides education for youths in this Commonwealth and thereby serves a charitable purpose.

The next element of the *HUP* test is satisfied in that W & J donates or renders gratuitously a substantial portion of its services. It does so by absorbing massive tuition charges that would otherwise be charged to the students. This results in an annual disbursement of substantial amounts of essentially free, or partially free, education for the approximately 1,100 students that comprise W & J's student body.[3]

---

**2.** The *HUP* criteria are a synthesis of prior case law, not a departure from precedent. See *HUP,* 507 Pa. at 23, 487 A.2d at 1318; *G.D.L. Plaza Corp. v. Council Rock School District,* 515 Pa. 54, 60, 526 A.2d 1173, 1176 (1987). Hence, cases decided prior to *HUP* remain relevant to our analysis.

**3.** In addition to assistance provided by W & J, students receive aid from various state and federal grant and loan programs.

For example, W & J awards numerous scholarships based on academic merit. There were 151 scholarships totaling $615,343, 141 totaling $547,800, and 126 totaling $436,385 for the academic years 1993–94, 1992–93, and 1991–92 respectively. W & J also contributes prodigious amounts of aid to students via grants that are based on financial need. There were 758 grants totaling $5,443,870, 769 totaling $4,482,568, and 681 totaling $3,065,024 for the academic years 1993–94, 1992–93, and 1991–92 respectively.[4] Approximately 845 students were recipients of scholarships, grants, and related aid from W & J in 1993–94; 850 were recipients in 1992–93; and 762 were recipients in 1991–92.[5] Scholarships, grants, and aid amounted to 30.5% of the college's total operating budget for 1992–93, and to 25.2% thereof for 1991–92.

In addition, W & J contributes large sums from its endowment to sustain its educational programs. In the academic years 1992–93 and 1991–92, at least 23% of W & J's operating budget was paid from endowment funds. By using these funds to finance educational programs rather than raising tuition prices to reflect true operating costs, W & J effectively subsidizes each and every student for a portion of the cost of his or her education. Further, W & J incurred operating losses in 1993–94, 1992–93, and 1991–92, respectively, in the amounts of $1,071,959 (projected), $470,631, and $939,848. These losses were covered by funds from the endowment, rather than by tuition increases. This demonstrates W & J's charitable character. See *Ogontz School Tax Exemption Case,* 361 Pa. at 295–96, 65 A.2d at 154–55 (schools which use endowment funds to cover part of their operating costs rather

**4.** In addition to scholarships and grants, which are available to the general student population, tuition remission and assistance are provided for students whose parents are employees of W & J and certain other colleges. The latter sums, however, are small in relation to the total of scholarships and grants. Tuition remission and assistance totaled $531,000, $447,560, and $443,580, respectively, for the years 1993–94, 1992–93, and 1991–92.

**5.** The total number of scholarships and grants exceeds the number of students benefitted because some students qualified for more than one form of assistance.

than charge all such costs to the students are charitable in character).

Due to the extensive use of scholarships, grants, and endowment funds, the typical student at W & J receives approximately 50% of his or her education without charge. In 1992–93, student tuition payments covered only 46.8% of the college's operating budget. In 1991–92, such payments covered only 51.7% of the budget. As we stated in *Pittsburgh Institute of Aeronautics Tax Exemption Cases,* 435 Pa. 618, 624, 258 A.2d 850, 853 (1969), "if the tuition only pays for one half the operating expenses, then every student is effectively getting a 50% scholarship irrespective of the number of formal scholarships offered."

■ Inasmuch as W & J collects only about half of its operating costs from its students, it essentially provides half of its educational services for free.[6] This level of assistance is well above what we have deemed adequate to qualify as a purely public charity. See *St. Margaret Seneca Place v. Board of Property Assessment Appeals and Review,* 536 Pa. 478, 486, 640 A.2d 380, 384 (1994) (nursing home that collected fees for its services and absorbed only one-sixth of its costs qualified for tax exemption as a purely public charity); *Presbyterian Homes Tax Exemption Case,* 428 Pa. 145, 153, 236 A.2d 776, 780 (1968) (rest home that collected fees from its residents and absorbed only one-fifth of its costs was a purely public charity).

■ The fact that tuition charges are levied by W & J does not negate the college's status as a charity. See *St. Margaret Seneca Place,* 536 Pa. at 486, 640 A.2d at 384 (collection of fees is appropriate since charities need not provide services that are *wholly* gratuitous); *Presbyterian Homes Tax Exemption Case,* 428 Pa. at 154, 236 A.2d at 780–81 (receipt of payment for services does not conflict with status as a purely public charity); *Hill School Tax Exemption Case,* 370 Pa. at 27, 87

6. In addition to providing free educational services, W & J makes many of its facilities available free of charge or at nominal cost for use by numerous community organizations and the public at large.

A.2d at 263 (educational institution that levies tuition charges does not thereby lose its status as a purely public charity). See also *HUP*, 507 Pa. at 19–20, 487 A.2d at 1315–16 (purely public charities can charge fees, provided that they render gratuitously a substantial portion of their services).

The scholarships, grants, and other aid provided by W & J were sufficiently substantial that, with the supplemental aid provided by state and federal grant and loan programs, nearly all students were able to pay the required fees, i.e., to pay the remaining portion of the $19,360 annual charge for tuition, room, board, and related fees. In fact, in 1993–94, only seven or eight students were excluded from enrollment as a result of inability or refusal to pay the required fees.

■ The next prong of the *HUP* test requires that W & J benefit a substantial and indefinite class of persons who are legitimate subjects of charity. Given our earlier conclusion that W & J advances a charitable purpose by providing youths with college education, it follows that youths seeking education can qualify as legitimate subjects of charity.

In this era when the cost of attending college poses a major obstacle for youths seeking to further their education, even students who are financially secure in other phases of life are often "poor" in relation to the financial outlays that college requires. W & J provides substantial aid for students who would not otherwise be able to afford a college education. Through scholarships and grants, as well as the use of endowment funds to subsidize the education of its students, W & J makes education attainable for innumerable youths who would not otherwise be able to afford it. See generally *HUP*, 507 Pa. at 19 n. 9, 487 A.2d at 1315 n. 9 (purely public charity must attempt to serve those who would not otherwise be able to pay the full fees).

The cost of education would climb precipitously if colleges did not use endowment funds and other forms of aid to keep their fees within bounds. For many youths, perhaps even most, the price of education would simply be beyond reach. Institutions such as W & J plainly serve those who would not

be able to afford the fees that would prevail in the absence of their benevolence.

The vast majority of the aid that W & J provides is directed to the financially needy, i.e., those who cannot afford the usual charges for tuition, room, and board. In fact, approximately 82% of the total aid that the college provides is comprised of need-based grants. Significantly, too, the admissions policies at W & J do not discriminate against applicants who will need such grants. Compare *Pittsburgh Institute of Aeronautics Tax Exemption Cases*, 435 Pa. at 624, 258 A.2d at 853, "[a] school in which the admission of students is almost totally limited to those who are able to pay their own way can hardly be considered a charitable institution. . . ."

■ The fact that scholarships, a smaller category of aid than grants, are awarded on the basis of academic achievement rather than on the basis of financial need is not inconsistent with W & J's charitable status. The process of awarding scholarships will no doubt result in some awards going to the financially needy and others going to those who would have been able to pay part or all of the cost of their education. There is no requirement, however, that all of the benefits bestowed by a purely public charity go *only* to the financially needy. See *Price v. Maxwell*, 28 Pa. at 34 ("Nor has it ever been supposed in this country, that an institution established for the purposes of education is not a charity within the meaning of the law, because it sheds its blessings, like the dews of Heaven, upon the rich as well as the poor.") See also *Presbyterian Homes Tax Exemption Case*, 428 Pa. at 152, 236 A.2d at 779–80 (charity can benefit both rich and poor); *Donohugh's Appeal*, 86 Pa. 306 (1878) (library constituted a charity that benefited all persons without regard to economic status).

■ Likewise, the existence of academic admissions standards is consistent with W & J's charitable status. As we stated in *Hill School Tax Exemption Case*, 370 Pa. at 26, 87 A.2d at 262, an "institution engaged in education of youth is a 'public charity' if its doors are open to the public generally or

a well defined class thereof, subject to reasonable entrance requirements." Consistent with this, enrollment at W & J is open to the public for anyone who can meet its academic requirements.[7]

To satisfy the next element of the *HUP* test, it is necessary that W & J relieve the government of some of its burden. This element is plainly met inasmuch as W & J, like other independent colleges and universities, relieves the load placed on the state-owned system of colleges and universities. So large is the role of private colleges and universities that they account for nearly 40% of Pennsylvania's undergraduate enrollment. Inasmuch as the Commonwealth has taken on the responsibility of providing higher education for its residents, it is clear that were it not for the existence of independent colleges and universities the demands placed on the state's institutions would be vastly expanded. The legislature has expressly recognized the role of private institutions in this regard by providing them with institutional assistance grants that cover a small percentage of their costs. State assistance received by W & J, for example, averages $391 per student on an annual basis.[8] The legislature has declared that independent colleges and universities "make a significant contribution to higher education in the Commonwealth," 24 P.S. § 5182(a), and that if such institutions were inhibited in their ability to provide such education it would *"increase the burden on public institutions,"* 24 P.S. § 5182(b) (emphasis added).

The final prong of the *HUP* test requires that W & J operate entirely free from private profit motive. The record demonstrates that W & J has, since its very origin,

---

**7.** W & J also offers a program for academically underprivileged students, those with a grade point average of 2.1 or less, and ten percent of the first year class enters this program.

**8.** The fact that W & J receives some payments from the Commonwealth does not negate W & J's role in relieving the government of its burden, since the payments to W & J are far less than the costs that would be incurred if state institutions were called upon to provide the same educational services. Further, purely public charities need not forgo available government payments that cover portions of their costs. *St. Margaret Seneca Place,* 536 Pa. at 486–87, 640 A.2d at 384–85.

operated without any intention of producing private gain. The college traces its roots to the eighteenth century when ministers of the Presbyterian Church, who sought not personal profit but rather a means of providing education for youths, created two colleges that were later combined to form W & J. W & J has long been incorporated as a non-profit corporation. Its trustees serve without receiving any salary for their services. No dividends or profits are distributed to any individuals. If W & J were to generate an operating surplus, the surplus would be reinvested in the college. See *West Allegheny Hospital v. Board of Property Assessment*, 500 Pa. 236, 455 A.2d 1170 (1982) (operating surplus of a charity may properly be applied to maintenance and expansion of its facilities). However, as heretofore described, W & J has incurred substantial operating losses in recent years. Given the large sums of aid that the college provides through scholarships, need-based grants, and endowment utilization, it is clear that W & J provides education at far less than its cost. Supplying educational services below cost provides evidence of a lack of profit motive. See *Ogontz School Tax Exemption Case*, supra. See also *HUP*, 507 Pa. at 17, 487 A.2d at 1314 (enterprises operated for profit do not supply all of their services for less than actual cost.).

We conclude, therefore, that the Commonwealth Court properly held that W & J satisfies all five elements of the *HUP* test. Hence, W & J can claim exemption from tax as a purely public charity.

Order affirmed.

NEWMAN, J., did not participate in the consideration or decision of this case.

ZAPPALA, J., concurs in the result.

NIGRO, J., files a dissenting opinion.

NIGRO, Justice, dissenting.

I respectfully dissent from the majority's conclusion that Washington & Jefferson College is a purely public charity. In

mechanically applying the *HUP* test, the majority has so broadly construed its requirements that any private college or university can satisfy the test and obtain tax-exempt status.

In establishing the test for a purely public charity, the Court looked to its earlier decisions defining charitable organizations. The Court stated:

> The word 'charitable', in a legal sense, includes every gift for a general public use, to be applied, consistent with existing laws, for the benefit of an indefinite number of persons, and designed to benefit them for an educational, religious, oral, physical or social standpoint. In its broadest meaning it is understood "to refer to something done or given for the benefit of our fellows or the public." (citation omitted).

*Hospital Utilization Project v. Commonwealth,* 507 Pa. 1, 18, 487 A.2d 1306, 1315 (1985). Washington & Jefferson College educates those who can afford to pay the annual $20,000 a year cost of tuition, room and board. As a practical matter, the College's doors are closed to many. The College gives the majority of its students financial assistance but yet those who still cannot afford to attend may not enroll.

Private colleges such as Washington & Jefferson College have been categorically exempted from taxation essentially because—like hospitals—they are non-profit organizations. The fact that an entity reinvests its revenue within, however, does not make it a charitable organization serving the general public. I doubt that the general public views private universities and hospitals as charitable organizations.

Providing private higher education and health care is certainly socially beneficial and valuable to society. I appreciate the common good that these institutions advance. However, many private entities are valuable to society. It does not logically follow that they are charitable. Common sense dictates that if these institutions can so easily satisfy the *HUP* test for tax exemption, the test is being applied too broadly or is crying out for revision.

The *HUP* test should be applied to reinforce the traditional characteristics of charities rather than to expand their scope to the point that the term 'charity' is meaningless. As a result of finding that Washington & Jefferson College is a purely public charity, it will receive municipal services for the 87 properties at issue in this suit at no cost. As colleges and hospitals expand throughout the municipalities of this Commonwealth, it is the individual taxpayer who is left shouldering the burden of these institutions' tax-free status. For these reasons, I dissent.