515 A.2d 59

Appeal of the Lutheran Home at Topton, Pennsylvania from the Decision of the Board of Assessment Appeals of Lehigh County. The Board of Assessment Appeals of Lehigh County, County of Lehigh, Twp. of South Whitehall and Parkland School District. County of Lehigh, Appellant.

Appeal of the Lutheran Home at Topton, Pennsylvania from the Decision of the Board of Assessment Appeals of Lehigh County. The Lutheran Home at Topton, Appellant *v.* The Board of Assessment Appeals of Lehigh County, County of Lehigh, Twp. of South Whitehall and Parkland School District, Appellees.

Argued May 12, 1986, before Judges MACPHAIL and COLINS, and Senior Judge BARBIERI, sitting as a panel of three.

*Jeffrey R. Dimmich,* Assistant County Solicitor, *Snyder & Dimmich,* with him, *Lawrence J. Brenner,* for appellant/appellee, Lehigh County.

*William G. Malkames,* with him, *Mark Malkames,* for appellee/appellant, Lutheran Home at Topton, Pennsylvania.

OPINION BY JUDGE MACPHAIL, September 3, 1986:

The Board of Assessment Appeals of Lehigh County (Board) appeals here from a decision of the Court of Common Pleas of Lehigh County which sustained the real estate tax exemption claim of the Lutheran Home at Topton, Pennsylvania (Home) with respect to its Luther Crest retirement residence.

The Home, a non-profit corporation, owns and operates Luther Crest as well as several other retirement facilities. Luther Crest consists of 310 residential apartments, a common dining room, an auditorium, a gift shop, an activity room, a library, administrative offices, and a 60-bed nursing facility.

On September 20, 1982, the Board exempted Luther Crest from the payment of all real estate taxes effective January 1, 1983 pursuant to an appeal filed by Luther Crest on September 1, 1982. On December 23, 1982, our Supreme Court handed down its decision in *Appeal of Marple Newton School District,* 500 Pa. 160, 455 A.2d 98 (1982). On March 4, 1983, the County of Lehigh (County) filed with the Board a request for reconsideration of the September 20, 1982 decision averring as the sole grounds therefore that *Marple Newton* mandated a reversal of the Board's decision. The Board granted the County's request for reconsideration, and following a hearing, reversed itself and held that Luther Crest was not entitled to a real estate tax exemption.

The Home appealed the Board's decision to the Court of Common Pleas of Lehigh County, claiming (1) that because the County did not appeal from the September 20, 1982 decision, the Board was without the power to rehear the case and (2) assuming the Board properly heard the matter, the *Marple Newton School District* decision did not warrant the Board's reversal of Luther Crest's tax exempt status.

A hearing was held by the court November 14-15, 1984. By decision dated January 25, 1985, the court first held that "where . . . the County seeks *reconsideration* by the Board, and authority exists for the County to ask the Board to correct allegedly erroneous and/or improper assessments after the normal time for appeal has run, we are not inclined to dismiss the substantial substantive question because of possible procedural imperfections." *Appeal of the Lutheran Home at Topton, Pennsylvania,* (Opinion) (No. 83-C-1988 Assessment Appeal, filed January 25, 1984), slip op. at 8 (emphasis in original). The court, however, then went on to hold that the residential units and health center at Luther Crest are devoted to charitable purposes and that the facility was founded and maintained by private charity.

The County filed an appeal to this Court from the trial court's order sustaining the Home's tax exemption claim; the Home cross-appealed[1] on the issue of the timeliness of the County's request for reconsideration of the original Board decision.

We shall first address the issue of whether the Board properly reconsidered its original decision. The Home argues that the County had thirty days[2] from which to appeal the Board's September 20, 1982 decision granting Luther Crest tax exempt status, and when the County failed to appeal within that time frame, it was precluded from thereafter appealing the decision in the form of a "Petition for Reconsideration." The Home further points out that the right to petition an administrative agency, such as the Board, to reconsider its decision after a statutorily prescribed appeal period has expired, must be a right that is conferred by statute or regulation, and no such statute or regulation permits the

---

[1] This appeal is No. 512 C.D. 1985 and was consolidated with No. 498 C.D. 1985 for our disposition.

[2] *See* 42 Pa. C. S. §5571(b).

County to petition the Board to reconsider the original decision. *See Olson v. Borough of Homestead,* 66 Pa. Commonwealth Ct. 120, 443 A.2d 875 (1982). The County concedes that it did not file a timely appeal from the Board's original decision but argues that *Appeal of Marple Newton School District* changed the law applicable to Luther Crest, and that therefore the Board was obliged to "correct" its error in law.

Assessments in third class counties, such as Lehigh County, are governed by the provisions of the Third Class County Assessment Law (Assessment Law), Act of June 26, 1931, P.L. 1379, *as amended,* 72 P.S. §§5342-5350k. The Assessment Law provides that the Board must make annual assessments, 72 P.S. §5344(a). Section 7 of the Assessment Law, 72 P.S. §5348 further provides that:

> (a) The said board shall, on or before the first day of July, examine and revise the said annual assessments and valuations, increasing or decreasing the same as in their judgment may seem proper . . . ; and such added assessments may be used for the taxation of the property . . . for the following calendar and fiscal tax years for which the assessment roll is being prepared, for the current year and for the preceding three years if there was liability for such taxes under existing law.

> (b) The board shall, on or before the fifteenth day of July, prepare an assessment roll or list of persons and property subject to local taxation, together with the value placed upon each person and each parcel or tract of real property. The board shall at the same time prepare a list of all property exempted by the law from taxation.

> . . . .

> (f) The board is authorized to make additions and revisions to the assessment roll of persons

and property subject to local taxation at any time in the year, so long as the notice provisions of subsection (b) of section 8 are complied with. All additions and revisions shall be a supplement to the assessment roll for levy and collection of taxes for the tax year for which the assessment roll was originally prepared, in addition to being added to the assessment roll for the following calendar or fiscal tax years.

Section 8 of the Assessment Law, 72 P.S. §5349 states:

(b) The board shall cause to be mailed to each owner of property . . . assessed and taxing district having any interest therein, . . . the value of whose property . . . assessment has been changed from that finally fixed in the preceding assessment roll . . . , a notice of such change . . . and the amount of the new assessment. . . . Such notice shall be mailed within five days from the date the board made such change . . . and shall state that any person aggrieved by any assessment and the said taxing districts may appeal to the board for trial by filing with the board, within forty days of the date of such notice, an appeal, in writing, designating the assessment or assessments by which such person is aggrieved. . . .

[(c)] Any person or such taxing district desiring to make an appeal shall, on or before the first day of September, file with the board an appeal.

. . . .

. . . .

(d.4) When the board has completed the hearing of appeals and has in each case entered its order it shall make such changes in the as-

sessment roll as will make it conform to such orders.

A further appeal to court is provided in Section 9 of the Assessment Law, 72 P.S. §5350.

It is apparent that no provision of the Assessment Law authorizes the Board to reconsider its September 20, 1982 decision. The County failed to timely appeal the September 20, 1982 decision and is therefore foreclosed from challenging the merits of the September 20, 1982 decision. We hold that the Board acted without authority in reconsidering Luther Crest's tax exempt status for the 1983 tax year, and the September 20, 1982 decision is hereby reinstated.

The September 20, 1982 decision exempted Luther Crest from the payment of real estate taxes effective January 1, 1983, "[s]aid exemption to continue as long as the use justifies the exemption." As noted, the Assessment Law authorizes the Board to re-examine and change assessments on an annual basis. Since the Board would have the authority to change Luther Crest's tax exempt status for 1984 and subsequent tax years, in the interest of judicial economy we will undertake to evaluate whether the Home is entitled to real estate tax exemption for years subsequent to 1983 with respect to Luther Crest as provided for in Section 204(a)(3) of The General County Assessment Law (Law), Act of May 22, 1933, P.L. 853, *as amended,* 72 P.S. §5020-204(a)(3).

Whether Luther Crest is entitled to an exemption is a mixed question of law and fact. *Hill School Tax Exemption Case,* 370 Pa. 21, 87 A.2d 259 (1952); *General Conference Mennonite Church Appeal,* 72 Pa. Commonwealth Ct. 96, 455 A.2d 1274 (1983), and the Home bears the heavy burden of bringing itself within the ambit of the exemption. *Presbyterian-University of Pennsylvania Medical Center v. Board of Revision of Taxes,* 24 Pa. Commonwealth Ct. 461, 357 A.2d 696

(1976). The decision of the trial court sustaining the Home's entitlement to an exemption will be affirmed unless we find abuse of discretion or lack of supporting evidence. *Appeal of Bucks County Board of Assessment Appeals,* 55 Pa. Commonwealth Ct. 195, 423 A.2d 760 (1980).

To sustain its claim for real estate tax exemption for Luther Crest, the Home must have affirmatively shown that Luther Crest "(1) is one of 'purely public charity'; (2) was founded by public or private charity; (3) is maintained by public or private charity." *Appeal of the Episcopal Community Services of the Diocese of Pennsylvania,* 90 Pa. Commonwealth Ct. 409, 415, 495 A.2d 653, 656 (1985), quoting *Woods School Tax Exemption Case,* 406 Pa. 579, 584, 178 A.2d 600, 602 (1962). It is the County's position here that Luther Crest is not one of "purely public charity."

Our Supreme Court's most recent pronouncement of what constitutes a purely public charity, *Hospital Utilization Project v. Commonwealth,* 507 Pa. 1, 487 A.2d 1306 (1985) provides that for an entity to qualify as a purely public charity, it must possess the following characteristics:

(a) Advances a charitable purpose;

(b) Donates or renders gratuitously a substantial portion of its services;

(c) Benefits a substantial and indefinite class of persons who are legitimate subjects of charity;

(d) Relieves the government of some of its burden; and

(e) Operates entirely free from private profit motive.

507 Pa. at 22, 487 A.2d at 1317. With these principles in mind, we will examine the record facts.

Rev. Paul L. Buehrle, the Executive Director of the Home, testified at the hearings below that the Home supervises several family service operations which in-

clude nursing facilities for the elderly and retirement villages. The Board of Trustees of the Home (Trustees) decided to establish Luther Crest, because, in Rev. Buehrle's own words:

> We serve a rather sizeable constituency in our North Eastern Pennsylvania Senate [sic], particularly in what is known as the lower tier of the Senate [sic] and that constituency was saying, we need some kind of service for retirement living. There are a lot of low-income projects spread throughout our area but those of us who have been a little more fortunate, who have not been able to be admitted through those low-income facilities, have the same kinds of concerns and needs in our old age, and need is not based on economics. . . .
>
> [T]he result was Luther Crest. . . .[3]

To be eligible for admission into Luther Crest, the applicant must be at least 62 years of age and capable of independent living. No one is denied admission because of race, color, creed or national origin.

The admission policy requires an applicant to fill out an application,[4] including a Financial Analysis form, and the application is reviewed by the Home's committee on admissions and services to the aging.[5] A non-refundable application fee of $125 is charged. It is Luther Crest's policy not to refuse admission because of the applicant's financial status or assets.[6] In practice, however, there is a minimum level of financial ability required to qualify an applicant for admission: Luther Crest uses a 1.0 ratio index, representing the estimated cost during the applicant's life expectancy over the estimated value of assets

---

[3] Notes of Testimony (N.T.) at 34-35.

[4] N.T. at 51.

[5] *Id.*

[6] N.T. at 36.

and income.[7] Receiving a rating of 1.0 means that the estimated cost for the life expectancy of the individual who is being analyzed exactly equals the estimated value of their assets and income during their life expectancy.[8] Of the 201 applicants admitted to Luther Crest, the Home claimed that 25% did not achieve the 1.0 ratio.[9]

Once admitted,[10] each resident is charged an admission or entrance fee, which at the time of hearing ranged from $43,900.00 for a studio apartment to

---

[7] N.T. at 54.

[8] N.T. at 233.

[9] N.T. at 55.

[10] Each resident is required to sign a "Residence and Care Agreement" which provides in pertinent part:

**General Conditions**

**1. Definitions of Words and Phrases.**

'Current Rate Schedule' means the published rate schedule which lists charges for services rendered by The Lutheran Home in effect at any one time. All charges for services will be made in accordance with the Current Rate Schedule, which may be changed from time to time at The Lutheran Home's sole discretion.

. . . .

'Health Care Center' means the intermediate and skilled nursing facility at the Community.

. . . .

**3. Services Provided Resident.**

A. *Utilities.* Reasonable amounts of water, sewer, heat, electricity and air conditioning service will be provided to Resident without a separate charge. If utilities are or can be separately metered for the Unit, The Lutheran Home reserves the right to establish (in its sole judgment) a maximum use level and to charge Resident for any excessive use.

B. *Housekeeping.* Resident will maintain the Unit in a clean, sanitary and orderly condition and will perform or cause to be performed all usual light housekeeping tasks in that connection. The Lutheran Home will provide at least twice monthly such housekeeping services as it deems

$85,900.00 for a two bedroom unit.[11] Residents are also subject to monthly maintenance fees, ranging from $830.00 a month for the studio apartment to $1,838.00 a month for two residents in the two bedroom apart-

---

necessary. The Lutheran Home will furnish and launder its standard bath and bed linens weekly.

C. *Maintenance and Repair.* The Lutheran Home will provide replacements for and perform necessary repairs and maintenance to property and equipment owned by The Lutheran Home. Resident will be responsible for the repair, maintenance and replacement of property owned by Resident.

. . . .

H. *Food and Meals.*

(i) Dining Room Service. Dinner (or a different meal of Resident's choice) will be provided by The Lutheran Home as part of the services included in the Monthly Service Fee. Additional meals will be available at extra cost. The Lutheran Home will consider other meal plans in response to the needs and interests of the residents.

(ii) Tray Service. Tray service will be provided in the Unit for minor short-term illness and while Resident is an occupant of the Health Care Center, if such service is ordered by the Medical Director. Meals in excess of those for which Resident has contracted will be billed at prevailing fees.

(iii) Other Services. Meals containing reasonable substitute or alternate diets will be provided without additional charge when approved by the Medical Director.

4. General Health Care

A. Long-Term Care (Not covered by Medicare or Other Insurance Program).

(i) While many health care services are expected to be available within the Community, payment for all services except those specifically listed in subparagraph (ii) below will be at the expense of Resident. The Lutheran Home will use its best efforts to have providers of health care services available at or near the Community who will accept as 'payment in full' charges which are determined as reasonable by Medicare. Resident will be obligated to pro-

ment.[12] There is testimony which would indicate that these monthly service charges exceed that of other area retirement facilities, profit and non-profit alike. N.T. at 316-318.

---

cure and retain insurance coverage as provided in subparagraph B below.

(ii) In return for payment of all fees, The Lutheran Home will provide:

(a) emergency nursing services which are rendered within the community, and

(b) semi-private accommodations in the Health Care Center, including routine intermediate or skilled nursing care, if in the opinion of the Medical Director, Resident's condition requires such care.

(iii) If such nursing care is required, in the event space is not available in the Health Care Center, The Lutheran Home will place Resident in accommodations as nearly equal as possible to those of the Health Care Center. While Resident is a patient of such other accommodations, The Lutheran Home will make any payment necessary, over and above that which is provided by insurance programs required by subparagraph B below, to provide Resident with semi-private accommodations, routine nursing services and the meal which Resident is entitled to as part of the Monthly Service Fee, provided Resident continues to pay to The Lutheran Home all charges Resident would be obligated to pay while a resident of the Health Care Center, including charges for additional meals.

B. *Medical and Surgical Insurance*. The Community is designed to provide for the basic health needs of Resident, directly and indirectly; while, except as provided in subparagraph A above, the costs of such will be at the expense of the individual Resident. The Lutheran Home expects that portions of the costs of medicines, medical or surgical services or equipment required by Resident will be paid for by present or future federal, state, municipal or private plans or programs of medical/surgical or medical and surgical insurance including, without limitation, the benefits available pursuant to the Social Security Amendments of 1965 (commonly known as Medicare A & B).

No admission or entrance fees had been waived for any of the residents, and only two residents are paying amounts less than the required monthly maintenance

> Resident agrees to become and remain a member of the Blue Cross/Blue Shield 65 Special programs (or their equivalent), provided that such programs (or their equivalent) have or will qualify (effective July 1, 1982) under federal guidelines as 'Medigap' insurance. In the event that such programs (or their equivalent) do not qualify as 'Medigap' insurance, Resident agrees to become and remain a member of a private insurance plan acceptable to The Lutheran Home which does so qualify. . . .
>
> C. *Exclusions—Specific.* The Lutheran Home is not responsible for health care except to the extent covered in subparagraph A above. Without limiting the generality of the foregoing, The Lutheran Home is not responsible for payment of physician services, meals (other than the one meal Resident is entitled to as part of the Monthly Service Fee), medicine, outpatient services and hospital costs. Each Resident is encouraged to consider carefully the coverage provisions of Medicare and Blue Cross/Blue Shield, or alternate insurance. Resident should note that, in general, the following items are not the responsibility of The Lutheran Home and may not be covered in whole or in part by any health insurance programs: dentistry, over the counter medicines, prescription drugs, care for psychiatric conditions, podiatry, refractions, eye glasses, hearing aids, orthopedic appliances, physical therapy when not medically necessary as determined by Medicare (or alternate insurers), occupational therapy and other therapies when not deemed medically necessary by Medicare (or alternate insurers).
>
> . . . .
>
> **5. Monthly Care and Service Fee.**
>
> A. *Basic Fee.* The initial Monthly Service Fee shall be paid to The Lutheran Home as provided in paragraph 3 of this Agreement and thereafter on or before the fifth (5th) day after receipt of The Lutheran Home's monthly statement. The Lutheran Home will furnish monthly statements to Resident showing the Monthly Service Fee and any other sums which are chargeable to Resident in

fee.[13] The Trustees, who we have noted have the sole discretion to subsidize a resident or not, determined that these two residents qualified for a subsidy because both had made sizeable contributions, in one form or

accordance with the Current Rate Schedule. Interest will be charged on late payments at the rate provided from time to time in the Current Rate Schedule.

. . . .

C. *Policy Respecting Financial Ability*. It is the policy of The Lutheran Home that Resident shall not be dismissed nor this Agreement terminated solely because of Resident's financial inability to pay the Monthly Service Fee or other charges, if (a) *Resident presents to The Lutheran Home facts which, in The Lutheran Home's opinion, justify special financial consideration, and (b) any necessary subsidy can be granted or continued without impairing the ability of The Lutheran Home to attain its objectives while operating on a sound financial basis*. The Lutheran Home may discontinue or reduce any subsidy if (x) there is a change in Resident's circumstances permitting Resident to bear all or an increased portion of his Monthly Service Fee or other charges, or (y) any factual representation by Resident presented in support of a request for special financial consideration is determined to have been inaccurate, or (z) *the continuation of such subsidy will, in The Lutheran Home's opinion, impair the ability of The Lutheran Home to attain its objectives while operating on a sound financial basis*. The Lutheran Home may take into consideration future economic conditions and the ability of Resident's estate to satisfy financial obligations when making a determination regarding Resident's request for a subsidy under this Agreement. The following provisions are related to the foregoing statement of policy:

. . . .

(ii) Reduction of Income. Resident believes and acknowledges that Resident's sources of income and/or capital are adequate to meet Resident's present and future financial responsibilities to The Lutheran Home and to cover personal and incidental expenses during the period of residency, with due consideration for future economic considerations.

another, to the Lutheran Church in America prior to their admittance to Luther Crest.[14] The Trustees reduced the financial requirements for those individuals based on their years of service in the church.[15]

---

(iii) Outside Assistance. If Resident's sources of income and/or capital do not meet these requirements, Resident shall make every reasonable effort to obtain assistance from family or by other available means, and if Resident can qualify, Resident shall take the necessary steps (with reasonable assistance from The Lutheran Home if requested by Resident) to obtain County, State, or Federal aid or assistance. Since it is understood that frequently the cost to a facility to participate in the Medicaid program for a small number of persons may be greater than any benefit to be received, The Lutheran Home reserves the right, in its sole discretion, to begin, continue or cease participating in the Medicaid program. If Resident's income decreases so that Resident cannot make the payments due under this Agreement, then The Lutheran Home, *in its sole discretion, may choose either (or neither) of the following alternatives:*

(a) If the Lutheran Home chooses to participate in the Medicaid Program, Resident shall be relieved by amendment to this Agreement from paying that portion of the Monthly Service Fee which provides for long-term care. If, in such case, Resident should subsequently need long-term care, The Lutheran Home shall assist Resident in obtaining Medicaid for Resident's long-term care needs. In this event, The Lutheran Home agrees that regardless of the prevailing Medicaid rates, The Lutheran Home will accept in full payment for the portion of the Monthly Service Fee of which Resident was relieved, the amount allowed by Medicaid, or

(b) If The Lutheran Home chooses not to participate in the Medicaid program, Resident's Monthly Service Fee will be subsidized in accordance with the conditions imposed by subparagraph (v) below and Resident will receive long-term care, notwithstanding the fact that Resident is unable to pay that portion of the Monthly Service Fee attributable to long-term care.

There was also testimony that the actual maintenance cost for Luther Crest exceeds the amount charged by $3.4 million and that the Home is in effect subsidizing all of the residents.[16]

In all, there are 201 residents occupying 169 units at Luther Crest, with 63 unoccupied but "committed" units. In order to be considered a "committed" unit, the application fee and a downpayment of $1,000.00 must be received by the Home. It follows that there are 78 unoccupied and uncommitted "empty" units. N.T. at 171-73.

The health care facility on the Luther Crest premises is a 60-bed intermediate and skilled care nursing center whose facilities are open to the community and are not restricted to residents of Luther Crest.[17] Of the 60 available beds, 53 were occupied by the community, 5 were occupied by residents of Luther Crest, and 2 were unoccupied and "reserved" for Luther Crest

---

(iv) Subsidy by Community. If Resident's Entrance Fee or Monthly Service Fee or other charges are subsidized wholly or partly by The Lutheran Home, Resident shall not sell or otherwise transfer property. . . .

(v) Board Determination. *All determinations made by the Board of Trustees, or its designees, concerning the granting or continuance of special financial consideration shall be final.* . . .

(Emphasis added.)

[11] N.T. at 85.

[12] N.T. at 89.

[13] N.T. at 60, 62.

[14] N.T. at 62. A review of the Home's Answers to the County's Interrogatories and Request for the Production of Documents, First set, reveals that one entrance fee has been waived for one of the two families receiving a monthly subsidy. Answer to Interrogatory No. 4.

[15] N.T. at 63.

[16] N.T. at 244.

[17] N.T. at 73.

residents.[18] Of the 53 beds occupied by outside community residents, 3 were not paying the $65.00 a day[19] fee charged by the health care facility but were receiving medical assistance.[20]

The trial court held that the following findings compelled its conclusion that Luther Crest is entitled to tax exempt status:

> (1) That the entrance fee charged is not equal to the cost of construction of the 'units'; (2) that the entrance fee is determined by the number of occupants of each unit; (3) that although every applicant is required to make a full financial disclosure, financial independence is not a prerequisite to admission; (4) that [the Home] is obligated to care for residents who become either financially unable to meet their monthly charges or physically dependent because of illness; (5) that entrance fees are wholly or partially refundable in accordance with the Residence and Care Agreement and/or the Refundable Admission Program, and (6) that the health care center is open to the public, not primarily to residents of Luther Crest.

Opinion, slip op. at 11-12 (footnote omitted).[21] We realize that the trial court did not have the benefit of our Supreme Court's decision in *Hospital Utilization Project* when it determined that the Home was entitled to the real estate tax exemption for Luther Crest, but inasmuch as *Hospital Utilization Project* is the most recent refinement of factors to take into consideration when de-

---

[18] N.T. at 74.

[19] N.T. at 142.

[20] N.T. at 74.

[21] We do not see how the factors that the entrance fees charged by Luther Crest do not equal the cost of construction or that the entrance fees are refundable warrant an inference that Luther Crest is founded and *maintained* by private charity.

termining whether a facility qualifies as a purely public charity, we will undertake to evaluate the matter in light of *Hospital Utilization Project*.

It is axiomatic that the elderly are a legitimate subject of charity, but the Home is not, in our view, "advancing a charitable purpose", *Hospital Utilization Project*. The only beneficiaries of Luther Crest are its fee paying residents. The Luther Crest application process requires the payment of a $125.00 non-refundable fee, and although the Home submitted that in certain circumstances this fee could be waived, the Home had not as yet granted a waiver.

Although the Home avers that no application would be denied solely on account of financial inability, the Home conceded that residents *must* demonstrate a minimum financial ability. Only 2 of 201 residents are currently receiving a subsidy. Whether some of the other residents may require a subsidy at some later point in time is not determinative because these residents are not now receiving a subsidy toward their monthly charges.[22] Although evidence was received that the Home has granted subsidies for its residents at other facilities, this cannot be used to demonstrate its "good faith" commitment to grant future subsidies at Luther Crest. *See Presbyterian Homes Tax Exemption Case*, 428 Pa. 145, 236 A.2d 776 (1968) (prior cases are of limited value). Moreover, we are not persuaded that a realistic prospect of receiving a subsidy exists in the instant case: we are hard-pressed to conclude that Luther Crest will grant a subsidy to those who cannot afford its charges when more than 25% of its units remain empty. Moreover, the language in the Residence and Care

---

[22] N.T. at 137. Note that this figure is less than the 25% Rev. Buehrle testified to. *See supra* at 8. The lowest percentage accepted at Luther Crest was either .74 or .68, or 3/4 of what was needed to achieve the 1.0 rating. N.T. at 218.

Agreement reposes all waivers and decisions with respect to financial subsidies in the sole discretion of The Lutheran Home and its trustees. This reservation, while economically feasible, is incompatible with the requirement that the facility advance a charitable purpose.

The Home directs our attention to the fact that Luther Crest has been operating at a loss since its inception, and that the entrance fees and monthly maintenance charges serve no other purpose than to contribute to the support and maintenance of Luther Crest. *See West Allegheny Hospital v. Board of Property Assessment,* 500 Pa. 236, 455 A.2d 1170 (1982) (there need not be only nominal charges as long as charges go to support and maintenance). The Home submits that this shows that it is, in essence, subsidizing all of its residents. The County argues, however, that Luther Crest operated at a loss because it was only half occupied. The County submits that if Luther Crest were fully occupied, it would not be operating at a loss and that Luther Crest did not take into account the distinct probability that the units would be turned over and that it would be receiving additional fees from new residents. We are persuaded by the County's argument that Luther Crest operated at a loss not because it was providing subsidies to its residents but because it was not fully occupied.

Although Luther Crest has not realized a profit, and operates free from private profit motive, *Hospital Utilization Project,* these factors alone do not warrant the conclusion that Luther Crest is being put to a public charitable use. *See Pittsburgh Institute of Aeronautics Tax Exemption Case,* 435 Pa. 618, 258 A.2d 850 (1969). Luther Crest does not donate or render gratuitously any of its services: all of its residents pay fees approximating actual costs. Luther Crest is not relieving the govern-

ment of some of its "burden" of taking care of the elderly: there is no "burden" in providing services to paying customers, so to speak. *See West Allegheny Hospital.*

Referring once again to the characteristics our Supreme Court requires an entity to have in order to qualify as a purely public charity, we conclude that the record in the instant case is insufficient to show that Luther Crest advances a charitable purpose, donates or renders gratuitously a *substantial* portion of its services, benefits a substantial and indefinite class of persons *who are legitimate subjects of charity* or relieves the government of some of its burden. Luther Crest, therefore, is not entitled to exemption from taxation.[23]

Accordingly, we reverse the order of the Court of Common Pleas of Lehigh County.

## ORDER

The order of the Court of Common Pleas of Lehigh County in the above-captioned matter is reversed.

---

[23] Inasmuch as we have concluded that the purposes of Luther Crest are not charitable, the exemption with respect to the health care facility cannot be sustained as necessary to a charitable purpose. *See Appeal of Marple Newton School District.*

---

CONCURRING AND DISSENTING OPINION BY JUDGE COLINS:

The trial court's finding of fact number 6 stated "that the health care center is open to the public, not primarily to residents of Luther Crest." As such, it would appear that the health care facility is advancing a charitable purpose. Therefore, in my opinion, the matter should be remanded to the trial court for further factfinding and a determination as to the amount of partial exemption, if any, that Luther Crest would be entitled to for its operation of the health care facility. *See*

*Presbyterian-University of Pennsylvania Medical Center v. Board of Revision of Taxes, Appeal of City of Philadelphia,* 24 Pa. Commonwealth Ct. 461, 357 A.2d 696 (1976); *The Lutheran Home at Topton, Pennsylvania Tax Appeal,* 6 Pa. Commonwealth Ct. 199, 293 A.2d 888 (1972).

I agree with the majority's reasoning as it relates to the remainder of the opinion.