539 A.2d 895

In Re: Appeal of Lutheran Social Services, East Region, a Pennsylvania non-profit corporation, from the determination of the Lancaster County Board of Assessment Appeals, Tax Parcel No. 37-8K6-5-9, Municipality—Lititz Borough Assessment for the year 1986, Property of Lutheran Social Services—East Region Lutheran Social Services—East Region, Appellant.

Argued February 24, 1988, before Judges CRAIG and MACPHAIL, and Senior Judge BARBIERI, sitting as a panel of three.

*Robert W. Hallinger, Barley, Snyder, Cooper* & *Barber,* for appellant.

*Paul K. Allison,* for appellee.

OPINION BY JUDGE CRAIG, March 28, 1988:

Lutheran Social ·Services—East Region (LSS) appeals from an order of the Court of Common Pleas of Lancaster County that denied the tax exemption claim of LSS in regard to two portions of a parcel of real estate. The issue is whether either or both of those portions meet the constitutional and statutory requirements for exemption from real estate tax based on charitable use of the property.

## History

LSS is a non-profit corporation affiliated with the Luthern Church of America through the Central Pennsylvania Synod. LSS owns a 40-acre site in Lancaster County on ·which it operates a retirement ·community for the elderly known as Luther Acres, which consists of

a 98-bed nursing care facility, a 96-unit apartment building, known as the Luther Townehome Apartments, and 81 cottage units. The apartment building is attached to the nursing facility through an adjoining wing in which are located facilities that the two buildings share—chapel, dining room, kitchen, activities area, lounge and library.

In 1985 the Lancaster County Board of Assessment Appeals (board) reclassified the apartment building and the cottages from tax exempt to taxable; the board did not change the status of the nursing facility, which remains classified as tax exempt. LSS appealed the changes to the board, which affirmed its initial determination; LSS then appealed to the court of common pleas. After a hearing de novo, the court denied the appeal and held that the apartment building and cottages were not entitled to tax exempt status. This appeal followed.

## The Law

The Constitution of the Commonwealth of Pennsylvania authorizes the legislature to exempt by law from taxation "[i]nstitutions of *purely public charity,* but in the case of any real property tax exemptions only that portion of real property of such institution which is actually and regularly used for the purposes of the institution." Pa. Const. art. VIII, §2(a)(v) (emphasis added). Pursuant to that authorization, the legislature enacted section 204(a)(3) of the General County Assessment Law, Act of May 22, 1933, P.L. 853, *as amended,* 72 P.S. §5020-204(a)(3), which provides:

> (a) The following property shall be exempt from all county, city, borough, town, township, road, poor and school tax, to wit:
>
> . . . .
>
> (3) All hospitals, universities, colleges, seminaries, academies, associations and *institutions*

*of* learning, *benevolence, or charity,* including fire and rescue stations, with the grounds thereto annexed and necessary for the occupancy and enjoyment of the same, *founded, endowed, and maintained* by public or private charity. Provided, That the entire revenue derived by the same be applied to the support and to increase the efficiency and facilities thereof, the repair and the necessary increase of grounds and buildings thereof, and for no other purpose . . . . (Emphasis added.)

In *Hospital Utilization Project v. Commonwealth,* 507 Pa. 1, 487 A.2d 1306 (1985), our Supreme Court established a test to be used to determine when a particular entity meets the constitutional requirement of being a "purely public charity." After reviewing and analyzing the extensive case law in this area, the court stated:

From the foregoing it can be concluded that an entity qualifies as a purely public charity if it possesses the following characteristics.

(a) Advances a charitable purpose;

(b) Donates or renders gratuitously a substantial portion of its services;

(c) Benefits a substantial and indefinite class of persons who are legitimate subjects of charity;

(d) Relieves the government of some of its burden; and

(e) Operates entirely free from private profit motive.

*Hospital Utilization Project,* 507 Pa. at 21-22, 487 A.2d at 1317.

In addition to meeting these minimum requirements necessary to satisfy art. VIII, §2 of the Constitution, an entity claiming a real estate tax exemption must

also meet the requirements of the test established by the Supreme Court for determining compliance with §204(a)(3):

> For the [entity claiming exemption] to obtain the claimed exemption from taxation, it must affirmatively show that the entire institution, (1) is one of 'purely public charity'; (2) was founded by public or private charity; (3) is maintained by public or private charity.

*Woods Schools Tax Exemption Case,* 406 Pa. 579, 584, 178 A.2d 600, 602 (1962). *See G.D.L. Plaza Corporation v. Council Rock School District,* 515 Pa. 54, 59, n.2, 526 A.2d 1173, 1175 n.2 (1987).

The question of whether an institution is one of "purely public charity" is a mixed question of fact and law on which the trial court's decision is binding if there is no abuse of discretion nor lack of supporting evidence; the same is true for the questions of whether an institution is founded, endowed and maintained by public or private charity. *G.D.L. Plaza Corporation,* 515 Pa. at 59, 526 A.2d at 1175. Further, the Supreme Court has noted that, in these circumstances,

> 'prior cases have limited value as precedent,' Presbyterian Homes Tax Exemption Case, 428 Pa. 145, 149, 236 A.2d 776, 778 (1968), because of the continually changing nature of the concept of charity and the many variable circumstances of time, place, and purpose. Nevertheless, review of other decisions is helpful in identifying some of the criteria and characteristics which are necessary, though not necessarily, exclusive. or sufficient, to determining the issue.

*Id.* Therefore, we must carefully analyze the pertinent facts in the record before us.

## Analysis of Findings

The trial court found that applicants for admission to the Luther Townehome Apartments fill out an application form that does not request any financial information (Finding No. 7), nor is such information requested orally or received if volunteered during the application process, according to LSS's witnesses (N.T. 13, 52). The admission policy for the apartments is open and nondiscriminatory, with the only requirements being that the applicant be at least 62 years old and not in need of medical care; vacancies are filled from a waiting list in chronological order of application (Finding No. 11).

Apartment applicants pay a processing fee of $250, but they do not pay an admission fee (Finding No. 8). Each resident pays a single monthly fee that covers (1) rent (*i.e.,* a portion of the amortized loan for the facility), (2) utilities and (3) maintenance. For 1986 the total monthly fee averaged $360 (Finding No. 9). The monthly fee may be changed at any time on thirty days' notice. Some residents are exonerated from paying increases in the monthly fee; there were seventeen such residents in 1986 (Finding No. 10).

The monthly fees do not cover the operating expenses for the apartments; in 1986 the apartments operated at a deficit of more than $69,000 (Finding No. 9). LSS receives contributions from the Lutheran congregations of Lancaster and Lebanon Counties as financial support for Luther Acres (Finding No. 5). The Executive Director of LSS, Reverend Charles Scott, testified that, in addition to exonerating some individuals from paying increases in the monthly maintenance fee, LSS subsidizes all apartment residents, because the utility and maintenance portions of the monthly fee are below actual cost of operation (N.T. 16-17). Those fees are calculated by estimating actual costs, and then estimating

contributions from the congregations (approximately $160,000 in 1986) and other non-operating income to determine the amount of reduction (N.T. 16, 17, 32). He testified further that if any apartment resident needed nursing care, in the judgment of the medical director, the resident would be transferred to the nursing facility immediately, regardless of ability to pay medical costs; in the event that the resident could not pay those costs, part would be paid by government medical assistance and part would be absorbed by LSS (N.T. 20-21).

As to the operation of the cottages, the trial court found that the only requirement for admission is that the applicant not be in need of nursing care at the time of application, and vacancies are filled in chronological order (Finding No. 19). Applicants for the cottages pay an entrance fee, which, in 1986, ranged from $38,500 to $46,000, depending on the type of unit; the fee is based on the initial cost of construction for the particular unit or on the replacement value of it when possession changes (Finding No. 12). No cottage resident has ever been admitted without paying an entrance fee or by paying a reduced fee (Finding No. 15). LSS deposits the proceeds from the entrance fees into a reserve account, from which it makes bookkeeping entry withdrawals at a rate of one percent per month per cottage (Finding No. 17). Reverend Scott testified that if a resident dies, any balance in his account becomes the property of LSS; however, if a resident leaves voluntarily, the balance is returned to him (N.T. 39-40). Cottage residents pay a monthly maintenance fee, currently $85, and they pay their own utilities (Finding No. 13). In 1986 the operation of the cottages produced a profit of $91,353, which LSS deposited into its general operating account and used to pay operating expenses of all of LSS's facilities (Finding No. 18).

LSS absorbs approximately $20 per month per cottage unit, representing about one-half of the taxes paid per unit, and, in 1986, the institution exonerated five cottage residents from paying part of their monthly fees (Finding No. 14). In the event that a cottage resident cannot afford the monthly maintenance fee, LSS initiates action to secure financial aid for that resident from an appropriate agency or source (Finding No. 16). Reverend Scott testified that the agreement that cottage residents sign expressly provides that if a resident cannot afford to pay his monthly fees, he shall nevertheless be entitled to remain in his cottage so long as his health permits; however, no such case of total exoneration has yet arisen—partial exonerations have been sufficient (N.T. 37-38). Reverend Scott also testified that cottage residents were entitled to admission to the nursing facility in the same manner as that described above for apartment residents (N.T. 29).

The trial court reviewed the applicable law in this area and derived from it "one clear directive in deciding cases of tax exemption, namely, that the aggregate facts in each case are different and each aggregate must be decided on the total circumstances it presents." The court then stated:

> In deciding whether or not LSS is entitled to tax exemption, we are most persuaded by the fact that its combined operations of the apartment building and cottage complex resulted in a net profit in 1986. As noted in the Findings of Fact, the apartment building operated at a loss of $69,000.00, and the cottage complex realized a profit of $91,353.00, the net of which is a profit of $22,353.00. This profit was co-mingled [sic] with other LSS funds and used to support other LSS facilities.

> We believe that the apartment building and cottage complex operations must be viewed as

one for the purpose of determining profit, because the testimony established that LSS, even though it maintained separate bookkeeping ledgers, effectively consolidated their operations by co-mingling [sic] the profits. We believe also that this net profit generation is sufficient to deny LSS tax exempt status. *See* Presbyterian Homes Tax Exemption Case, *supra,* and Springfield Township Appeal, 90 Pa. Cmwlth. 409, 495 A.2d 653 (1985).

Thus the crucial conclusion the trial court drew from the evidence was that the apartments and cottages must be viewed as one operation for the purpose of determining exemption because of the commingling of their funds. We are mindful that our review of the trial court's decision is limited to determining whether the court has abused its discretion or whether there is a lack of support in the record for the trial court's conclusions. However, in our view this particular conclusion by the trial judge is not properly supported by the record.

The trial court expressly found that LSS placed the operating surplus generated by the cottage units into its general operating account and used that money to support the operations of *all* of LSS facilities, that is, the cottage, the apartments *and* the nursing facility (Finding No. 18). For this reason alone, the calculation of a net profit by subtracting the apartments' deficit from the cottages' surplus is arbitrary, because such a calculation does not reflect the actual disposition of the money in question.

Moreover, the record does not contain evidence tending to show that the operations of the two types of residence are combined. Reverend Scott testified that both the apartment and the cottage agreements provide for the immediate transfer of a resident *to the nursing facility* in the case of medical need, as determined

solely by the medical director, without regard to ability to pay medical costs, and he described various instances of such transfers. However, the agreements do not provide for transfers between the cottages and the apartments. Reverend Scott testified that some cottage residents had transferred to the apartments because apartment living requires less independence than cottage living, and that the resident and management jointly made the decision to transfer (N.T. 41). In such a case the cottage resident's entrance fee was refunded to him, minus one percent for each month of his stay in a cottage, the same as for any other cottage resident who left voluntarily, and the resident then entered the apartment building under the standard apartment agreement (N.T. 42). In our view this evidence supports a conclusion that the apartment and cottage uses in fact are separate and not, as the trial court concluded, one combined operation that maintained separate bookkeeping ledgers.

## *Apartments*

Having concluded that the apartments and cottages are separate uses for the purpose of determining exemption, we shall analyze each separately under the law outlined above. The apartment use appears to satisfy the elements of the constitutional test for "purely public charity" established in *Hospital Utilization Project*. As to the element of advancing a charitable purpose, the Supreme Court has expressly approved a trial court's synthesis "as a general principle from these cases that 'providing low cost housing for elderly persons *with limited incomes* constitutes a public charity.'" *G.D.L. Plaza v. Council Rock School District*, 515 Pa. 54, 60, 526 A.2d 1173, 1175 (1987) (emphasis in the original). Here, LSS charges monthly apartment fees that are by no

means exorbitant and that are below actual operating cost; it does not request or receive financial information from apartment applicants before admission, and it routinely grants exonerations from payment of a portion of the monthly fee to residents who later demonstrate financial need. These facts tend to indicate that the apartment operation is providing low cost housing for elderly persons with limited income.

As discussed above, the apartments subsidize all residents by charging less than actual cost for utilities and maintenance; also, the apartment management grants individual exonerations from some charges. The difference, more than $69,000 in 1986, is made up from contributions from church congregations and from other sources, such as the surplus from the cottage operation. Clearly the apartment operation is donating or rendering gratuitously a portion of its services. In our view this portion is substantial.[1]

The apartment operation at Luther Acres benefits a substantial and indefinite class of persons in that its admission policy is open and nondiscriminatory, and not based on any financial test. That members of this class

---

[1] The principle that a purely public charity does not cease to be such where it receives some payment for its services is firmly established. *See Hill School Tax Exemption Case,* 370 Pa. 21, 87 A.2d 259 (1952) *and Presbyterian Homes Tax Exemption Case,* 428 Pa. 145, 236 A.2d 776 (1968). As to what is a substantial portion of donated services, the Supreme Court has said:

> Whether or not the portion donated or rendered gratuitous is 'substantial' is a determination to be made based on the totality of circumstances surrounding the organization. The word 'substantial' does not imply a magical percentage. It must appear from the facts that the organization makes a bona fide effort to service primarily those who cannot afford the usual fee.

*Hospital Utilization Project,* 507 Pa. 1, 19 n.9, 487 A.2d 1306, 1315 n.9 (1985).

are the legitimate objects of charity is established by the fact that the residents are elderly and by the nature of the financial arrangements involved here. This is not a case such as that in *Appeal of Lutheran Home at Topton*, 100 Pa. Commonwealth Ct. 244, 515 A.2d 59 (1986), where applicants had to demonstrate a minimum level of financial ability for admission and to pay both high entrance fees and high monthly fees (exceeding those of area non-profit and profit facilities), thereby creating doubt as to whether the residents, though elderly, were the legitimate objects of charity.

That the apartment operation relieves the government of some of its burden appears likely. The apartments provide decent housing and opportunities for social contact for a sizable number of elderly citizens. The operation subsidizes this activity to a substantial degree from contributions from church congregations and from other private sources, such as the cottage surplus. Although one cannot say with certainty how much of this burden would fall on the government otherwise, these circumstances again are very different from those in *Appeal of Lutheran Home at Topton*, where this court concluded that "[the institution] does not donate or render gratuitously any of its services: all of its residents pay fees approximating actual costs. [The institution] is not relieving the government of some of its 'burden' of taking care of the elderly: there is no 'burden' in providing services to paying customers, so to speak." 100 Commonwealth Ct. at 262-63, 515 A.2d at 68.

Finally, the fact that the apartments consistently have operated at a deficit by design demonstrates that they are operated free from private profit motive. The testimony indicates that the apartment management promptly fills vacancies as they arise (N.T. 13), so this deficit cannot be attributed to failure to have the facility fully occupied rather than to subsidization, as was the

case in *Appeal of Lutheran Home at Topton. See id.* at 262, 515 A.2d at 67-68.

As to the apartments' compliance with the statutory requirements of section 204(a)(3), we note that the conclusion that the apartment operation is one of "purely public charity" satisfies the first prong of the test quoted above from *Woods Schools Tax Exemption Case.* There is no dispute in this case that the entire Luther Acres operation was founded by private charity, and we conclude that the apartments are maintained by private charity. The apartment residents do not pay the full cost of their own care, as the residents did in several cases where the courts have denied section 204(a)(3) exemptions. *See Appeal of Marple Newton School District,* 500 Pa. 160, 455 A.2d 98 (1982); *Appeal of Lutheran Home at Topton; Passavant Health Center v. Board of Assessment and Revision of Taxes of Butler County,* 93 Pa. Commonwealth Ct. 575, 502 A.2d 753 (1985). In other words, there is not merely a "realistic prospect" but rather a certainty of each apartment resident's receiving a financial subsidy. *See Appeal of Episcopal Community Services of the Diocese of Pennsylvania,* 90 Pa. Commonwealth Ct. 409, 421, 495 A.2d 653, 659 (1985). In addition, this is not a case such as that in *G.D.L. Plaza Corporation v. Council Rock School District,* where, although the residents were not paying the full cost of their care, the entire difference was made up, by design, through federal assistance programs, so that the institution itself was not donating any significant services, and so was not maintaining its operations through charity.

Therefore, we conclude that the Luther Townehome Apartments qualify for a real estate tax exemption under section 204(a)(3), and we reverse the trial court's contrary conclusion on this point for lack of support in the record.

### Cottages

The cottage operation at Luther Acres presents an entirely different situation. Even if the fact that the cottages provide housing for the elderly were held to satisfy the first *Hospital Utilization Project* criterion of advancing a charitable purpose, the cottage operation runs afoul of the second criterion, that of donating or rendering gratuitously a substantial portion of its services. The simple fact that the cottage operation consistently realizes a substantial profit demonstrates that no services are being rendered free to cottage residents. LSS's claim that it subsidizes cottage residents by not charging them $20 per month in taxes and by exonerating some from increases in the monthly maintenance fee is untenable. This "subsidization" is simply a bookkeeping fiction. The actual profit from the cottage operation is the reported profit minus these "subsidies", but that actual profit remains substantial.

In fact, the cottage operation here is almost identical to the one at issue in *Passavant Health Center v. Board of Assessment and Revision of Taxes of Butler County,* 93 Pa. Commonwealth Ct. 575, 502 A.2d 753 (1985). In *Passavant* the facilities of the non-profit corporation consisted of a nursing home, an apartment building and cottages. Only an assessment on cottages was in dispute.

Residents of the cottages paid entrance fees of $22,500 to $55,000, depending on the size of the cottages; in addition, they paid a monthly service fee of $85 for snow removal, lawn care, and so on, and they paid their own utilities. Cottage residents were automatically entitled to enter the nursing facility in cases of medical need without regard to ability to pay, but, as the court noted, that fact "evidence[d] a charitable purpose on the part of the nursing unit and not on the cottages themselves." *Passavant Health Center,* 93 Pa. Common-

wealth Ct. at 585, 502 A.2d at 757. Of the ninety-five cottage residents, only three or four were receiving a subsidy on the monthly rent charge, and only one person was receiving a subsidy on the payment of utilities, bills and service fees. The record demonstrated that the "independent living program" under which cottage residents were admitted was a money-maker for the overall program of services provided by Passavant. The only significant difference from the Luther Acres cottages was that applicants to the Passavant cottages were required to demonstrate financial ability in order to be considered for admission.

The court found that "these nineteen cottages represent a 'private housing facility which for all practical purposes offers its residents no services beyond those which the residents demonstrate an ability to afford.' " *Id.* (quoting *Appeal of Marple Newton School District,* 500 Pa. 160, 166, 455 A.2d 98, 100 (1982)). Therefore the court concluded that the record did not support the trial court's conclusion that the cottages were a purely public charity entitled to exemption from real estate taxation.

Although applicants to the cottages at Luther Acres are not required to demonstrate financial ability (beyond that of their ability to pay the substantial lump sum entrance fee), the two situations are otherwise very similar. The cottage operation at Luther Acres generates an operating surplus, which LSS then applies to funding the rest of the Luther Acres operation. In other words, the cottages are a money-maker for the overall program. Therefore, the possibility of any individual cottage resident's receiving a subsidy from LSS is remote.

The cottage operation sells something—housing for the elderly—at a profit, and LSS then uses that profit for the purposes above held to be charitable in nature.

However, the situation would be no different if LSS conducted some other business on the premises, manufacturing or retailing for example, at a profit, and then donated that profit to its charitable activities. Such fund-raising would be laudable but not, in the legal sense, charitable. We note that Pa. Const. art. VIII, §2(a)(v), although authorizing the legislature to exempt institutions of purely public charity, expressly prohibits the legislature from exempting from real property taxes any portion of the real property of such an institution not "actually and regularly used for the purposes of the institution." In exercising its authorization under this provision, the legislature has provided that "all property real or personal, other than that which is actually and regularly used and occupied for the purposes specified in this section, and *all property from which any income or revenue is derived, other than from recipients of the bounty of the institution or charity,* shall be subject to taxation, . . . and nothing herein contained shall exempt same therefrom." Section 204(b), 72 P.S. §5020-204(b) (emphasis added).

In this case, LSS is deriving income from the cottages, and the cottage residents are paying customers, not recipients of the bounty of the institution. We conclude that the cottages are not institutions of purely public charity, founded and maintained by public or private charity, and hence are not entitled to an exemption from local real estate taxation.

## ORDER

Now, March 28, 1988, the order of the Court of Common Pleas of Lancaster County, at No. 3940 of 1985, dated June 1, 1987, is reversed to the extent that it denied the appeal of Lutheran Social Services—East Region with regard to the claim for real estate tax exemption for the Luther Townehome Apartments. The

same order is affirmed to the extent that it denied the claim for real estate tax exemption for the cottages located at Luther Acres.